| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO: 2:10 CR 123 |
| | ) | |
| WILLIE HARRIS | ) | |
| | ) | |

## OPINION AND ORDER

Defendant Willie Harris was caught running a wide-ranging credit card fraud scheme. After a trial, he was convicted by a jury of two counts of identify theft, three counts of credit card fraud, aggravated identify theft, and conspiracy to commit fraud. Harris has now made four post-trial motions in anticipation of sentencing. First, he has moved for a judgment of acquittal, arguing that the evidence presented at trial was insufficient to connect him to the fraudulent acts alleged in Counts 4, 8, and 10 of the indictment [DE 546]. Next, he alleges the government violated Federal Rule of Criminal Procedure 11 by using evidence he provided in his proffer agreement against him in their case-in-chief [DE 547]. He has moved for the return of items that he claims were seized by the government and forfeited without his notice [DE 548]. And finally, he seeks an order compelling the government to produce evidence of the number of victims and loss amounts prior to his sentencing [DE 549]. For the reasons stated below, these motions are either without merit or moot. Accordingly, Harris's motions are **DENIED**.

## I. BACKGROUND

Harris was charged with participating in a credit card fraud conspiracy that lasted from March 2007 through January 2010 along with two counts of identity theft, three counts of credit card fraud, and one count of aggravated identity theft. Essentially, Harris and his co-conspirators were accused of obtaining the names and credit card numbers of victims and then impersonating

those victims in order to have their own names or aliases added as authorized users to the victims' credit card accounts. They then used these fraudulently obtained credit cards to make purchases, buy gift cards, and obtain cash advances and convenience checks on the victims' accounts. This was an extensive conspiracy, involving dozens of victims in twenty-three states and hundreds and thousands of dollars in losses.

The evidence adduced at trial established that Willie Harris was at the center of the conspiracy – directing the activities of several other co-conspirators. Although the fraudulent activity began in Indiana, after Harris was convicted of credit card fraud in state court, he moved the base of his operation to Georgia. Harris would fly his co-conspirators, mostly young women, from Indiana down to his home in Georgia and assist them in obtaining fraudulent Georgia identification. He would mail fraudulent credit cards to his co-conspirators in Indiana and Wisconsin and direct them to make cash advances on the cards. On a number of occasions, Harris flew to Indiana himself to assist with the transactions. Harris would drive the women from bank to bank, telling them how much money to request, sometimes even accompanying them to the counter as they requested the money.

Some of the government's most damning evidence included a series of recordings made by several credit card companies. These are the types of recordings customarily made by companies when customers call in for assistance. In these recordings, Harris poses as a real customer who is trying to convince the customer-service representative to add Harris's alias to the victim's account. Several of Harris's co-defendants testified that it was Harris's voice on those recordings. It is difficult to place into words just how compelling the recordings were and what they revealed about the true audacity of Harris's undertaking.

Five of Harris's co-defendants pled guilty and testified against him at trial. They all, more

or less, fingered Harris as the leader of this multi-state fraud ring which victimized dozens of people.  On May 10, 2013, a jury found Harris guilty on all seven counts on which he was charged.  Pursuant to Federal Rule of Criminal Procedure 29, he now challenges the guilty verdict on three of those counts.

## II.  DISCUSSION

### A.      Motion for Acquittal on Counts 4, 8, and 10

Harris argues there is insufficient evidence linking him to Counts 4, 8, and 10 of the indictment.  Federal Rule of Criminal Procedure 29 requires the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  However, "a defendant's burden in showing the evidence was insufficient to support a conviction is nearly insurmountable."  *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008).  A jury's guilty verdict will be set aside "only if the record contains *no evidence,* regardless of how it is weighed, from which a jury could have found the defendant was guilty."  *Id.* (emphasis added).  Put another way, the evidence must be "so scant that a jury could only speculate as to the defendant's guilt, and a reasonably minded jury must have had a reasonable doubt as to the defendant's guilt."  *United States v. Howard*, 179 F.3d 539, 542 (7th Cir. 1999).  In reviewing a motion for judgment of acquittal, I must view the evidence in the light most favorable to the government.  *Rollins*, 544 F.3d at 835.  It is not my job to play thirteenth juror, re-weigh the evidence myself, or second-guess the jury's assessment of the evidence.  *Id.*

Counts 4, 8, and 10 all stem from a November 9, 2007 transaction where Tereza Harris, an unindicted co-conspirator, obtained an unauthorized $3,800 cash advance on the Citibank credit card of the victim with the initials BS.  Based on this transaction, Count 4 charged Willie Harris with identity theft in violation of 18 U.S.C. § 1028(a)(7).  Count 8 charged Harris with credit card

fraud in violation of 18 U.S.C. § 1029(a)(2). Count 10 charged Harris with aggravated identity theft in violation of 18 U.S.C. § 1028A. In the alternative, the government charged Harris with aiding and abetting these offenses in violation of 18 U.S.C. § 2.

To prove credit card fraud, the government had to show that Harris 1) knowingly used or trafficked in an unauthorized credit card; 2) obtained at least $1,000 in any one year period by doing so; 3) did so with the intent to defraud; and 4) affected interstate commerce. *See* Seventh Circuit Pattern Instruction for 18 U.S.C. §§ 1029(a)(2). The identity theft charges then build off of the credit card fraud. To simplify, a person commits identity theft if they use someone else's identification while attempting to commit credit card fraud, and a person commits aggravated identity theft if they use the identification to actually commit the credit card fraud. More specifically, to prove identity theft, the government had to show that a defendant 1) knowingly transferred, possessed or used the means of identification of another person; 2) knew that the means of identification belonged to another person; 3) acted with intent to commit or aid and abet credit card fraud; 4) acted without lawful authority; and 5) the transfer, possession or use of the means of identification affected interstate commerce or the means of identification was transported in the mail in the course of the possession or use. *See* Seventh Circuit Pattern Instruction for 18 U.S.C. § 1028(a)(7). For aggravated identity theft, the government had to prove that the defendant 1) committed the underlying felony offense of credit card fraud; 2) knowingly transferred, possessed or used a means of identification during and in relation to the offense; 3) did so without lawful authority; and 4) knew the means of identification belonged to another person. *See* Seventh Circuit Pattern Instruction for 18 U.S.C. § 1028A.

Willie Harris does not dispute that someone committed credit card fraud relating to the account of BS. But according to Harris, it was BS herself who was in cahoots with Tereza Harris,

meaning that BS was somehow involved in the theft of her own identity. Harris's testimony in this regard was nothing short of preposterous. BS testified; she is a older lady who lives outside the State of Indiana. She testified that she did know Tereza Harris and under no circumstances did she allow Tereza Harris to be added as an authorized user on her credit card. (Tr. V.2, p. 254-258). She testified that she was not involved in this fraud and felt victimized by those who stole her identity and added someone to her credit card as an authorized user without her knowledge or consent. *Id.*

BS's testimony and bank records plainly establish that someone used BS's identity to add Tereza Harris as an authorized user on BS's credit card accounts and then used those fraudulently-obtained credit cards, now in Tereza Harris's name, to rack up thousands of dollars in unauthorized charges (Tr. V.2, p. 253-267; Tr. V.7, p. 104, 122-123). As for the transaction that forms the basis for Counts 4, 8 and 10, BS's testimony, bank records, and a photograph show that on November 9, 2007, Willie Harris accompanied Tereza Harris to a bank in Munster, Indiana. While in the bank Tereza Harris used one of the fraudulently-obtained credit cards to get a $3,800 cash advance. (Tr. V.2, p. 254; Government's Exhibit 18).

Willie Harris argues that there was insufficient evidence connecting him to Tereza Harris's activities. In other words, there was *no* evidence in the trial record that he perpetrated, or at least aided and abetted, the fraudulent transaction on November 9, 2007. *Rollins*, 544 F.3d at 835. Harris has a significant burden, and he cannot meet it as there is plenty of evidence in the record connecting him to the transaction. Most obviously, Harris was right there at the scene of the crime. Harris says that he was just there as an observer and was only being nosey, yet he also testified that he knew Tereza Harris had a fraudulently-obtained credit card connected to BS's account (Tr. V.8, p. 106-107). And that he knew Tereza Harris intended to use the credit card to

5

get money off of BS's account (Tr. V.8, p 107). In fact, the prospect of credit card fraud was Harris's stated reason for accompanying Tereza Harris into the bank. Here's what he testified to at trial in that regard:

Q:      Why is it that you were in the bank with her?

A:      I was just being nosey.

. . .

Q:      And why is that?

A:      I mean, it's a similar crime that I done before, so I was just with her.

(Tr. V.8, p. 107).

The most compelling evidence of Harris's complicity in the fraud involving BS's identity is Government's Exhibit 18 – a date-stamped photograph from a bank surveillance camera showing Willie Harris standing next to Tereza Harris as the bank employee handed out the cash. The photo appears to show Willie Harris grabbing, or at least with his hand on, the money. This evidence has to be considered in light of co-defendant Lauren Price's testimony that Willie Harris and Tereza Harris were involved in credit card fraud schemes exactly like the one perpetrated on BS (Tr. V.6. p. 212-213). And the days of testimony from government witnesses representing that Willie Harris was at the center of a credit card fraud conspiracy and had done what he was accused of doing with Tereza Harris with other co-conspirators at other banks. Given all this, the jury had sufficient evidence to convict Harris on Counts 4, 8, and 10 of the indictment.

Perhaps because the photograph in Government's Exhibit 18 is so compelling, Harris makes a couple more arguments in his motion related to the photograph. First he reiterates his argument at trial that the photograph should not have been admitted. At trial, I ruled that the photograph easily met the standard for admissibility when considered in light of the testimony of

the victim and Lauren Price, and the documentary evidence (Tr. V.7, p. 121-23). As I explained, Harris's objections to the photograph, that the government was trying to convict Harris based only on a photograph, went to its weight, not its admissibility (Tr. V.7, p. 121). The photograph was highly relevant as it appeared to be a picture of Willie Harris and Tereza Harris at the bank at the time of the fraudulent transaction. *Id.* at 122. Further, the photograph was part of an exhibit that included the bank's transaction report showing the cash advance that was made on BS's account and photocopies of Tereza Harris's state ID and the credit card she used that were made by the bank at the time of the transaction. *Id.* Defendant Harris has not made any new arguments in his motion, so I see no reason to reconsider my ruling on the admissibility of the photograph.

Finally, the Defendant argues that the government falsely stated during its closing argument that the photograph showed Willie Harris attempting to take the cash from the bank teller. This appears to be a prosecutorial misconduct argument in the midst of the Rule 29 motion and it fails for several reasons. First, the government's statement was not improper or even false; it was a reasonable characterization of the evidence. It is not totally clear what is going on in the photograph, but it certainly appears as if Willie Harris is standing at the bank teller window, that there is cash on the counter, and Harris's hand is on top of the cash. Harris was free to, and did, argue for a different interpretation, but the government's description of what was going on in that photograph was fair.

Second, even if the reference was improper, it did not deprive Harris of a fair trial. *United States v. Simmons*, 581 F.3d 582, 590 (7th Cir. 2009) (noting that a court can dispose of the prosecutorial misconduct issue if it finds the prosecutorial remarks were not prejudicial). Any possible prejudice was minimized by the jury instructions. At trial, I instructed the jury that 1)

the lawyer's statements and arguments are not evidence; 2) that they could use common sense in weighing the evidence, consider the evidence in light of everyday experience, and make reasonable inferences based on the evidence; and 3) they could consider direct and circumstantial evidence and give it the weight they determined (Tr.V.9, p. 95). So, Harris's final argument is without merit.

Accordingly, Defendants Motion for Court to Enter Judgment in Favor of Defendant on Counts 4, 8, and 10 [DE 546] is **DENIED.**

### B.       Motion for Relief for Government's Violation of Rule 11 Proffer Agreement

Harris argues that the government violated its Rule 11 proffer agreement by using evidence and information contained in the proffer against him in its case in chief. Specifically, Harris says he told the government that Shannell Montgomery was an alias used by Alnese Frazier and Diontria Frazier and that the government turned around and used that information against him. The government counters that, in the proffer agreement, Harris consented to their making derivative use of the information he gave, and that is all they did. The government has the better argument.

A proffer agreement is considered to be a contract and therefore must be enforced according to its terms. *United States v. Reed*, 272 F.3d 950, 954 (7th Cir. 2001). In this case, the proffer agreement signed by Willie Harris explicitly provided for the government's derivative use of Harris's statements to the government. The proffer agreement provides: "the government may make derivative use of, and may pursue investigative leads suggested by, any statements of information provided by your client's proffer." [DE 557-1 at 2]. Here the government used the information Harris gave them to track down the evidence that was introduced at trial. For example, the government introduced Georgia DMV records relating to the alias Chanel

8

Montgomery (Govt Exhibit 104). Further, Alnese Fraizer testified that she used the Chanel Montgomery alias and that it was her picture on the Chanel Montgomery Georgia Driver's license (Tr. V.5, p. 116, 181). There is no question that agreements allowing for derivative use of information provided in proffers are valid and enforceable. *See, e.g., United States v. Wyner*, 230 F.3d 1368 (9th Cir. 2000) (holding government's derivative use of a defendants proffer was allowed under the express terms of the agreement); *United States v. Pielago*, 135 F.3d 703 (11th Cir. 1998) (concluding the government did not violate its proffer agreement by introducing testimony of a cooperative witness whose existence was revealed to the government during the defendant's proffer). And Harris has not shown that the government violated the terms of the agreement. Accordingly, the Defendant's motion [DE 547] is **DENIED**.

### C. Motion for Return of Items Forfeited

In his third motion [DE 548], Harris seeks the return of any items forfeited by him that the government seized without notice. He admits that he did receive notice in the indictment that the government was seeking forfeiture of up to $198,137.00 worth of property, but argues that the government never provided notice of the specific items of property that the government seized. In addition, Harris wants an inventory of all items seized by the government and any items returned to his authorized family member. Finally, he wants the government to return a thumb drive with music on it.

Federal Rule of Criminal Procedure 32.2 provides that a court cannot enter a judgment of forfeiture in a criminal proceeding unless "the indictment contains notice to the defendant that the government will seek the forfeiture." However, the indictment "need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks." F. R. Crim. P. 32.2(a). The indictment in this case, as Harris acknowledges, stated that

the government was seeking forfeiture. That is all the notice Harris is entitled to. Moreover, Harris is being disingenuous when he claims that he didn't have notice of the items seized. The government has produced a letter from the United States Postal Inspection Service from way back in October 2010 that inventoried all of the items seized from Harris's apartment and notified him that these items were subject to forfeiture [DE 557-3]. I know Harris received the letter because the government also produced a November 2010 letter from Harris in response that attached the inventory and asked for the items back [DE 557-4]. So Harris's claim on this score is without merit.

As for his other objections, they are moot. The government has provided the inventories of items seized and the items returned to Harris's family member [DE 557-2 - 557-10] and represents that it will return the thumb drive [DE 557 at11]. Accordingly, Defendant's Motion for Return of Items Forfeited [DE 548] is **DENIED**.

**D.    Motion to Produce Evidence of Number of Victims and Loss Amounts**

Finally, Harris has moved for the government to produce evidence of the number of victims and loss amounts prior to sentencing [DE 549]. I held a hearing on Defendant's objections to the pre-sentence investigation report on February 27, 2014 [DE 563]. At that hearing, the government produced the requested evidence. Accordingly, Defendant's motion [DE 549] is **DENIED** as moot.

**CONCLUSION**

Defendant's four post-trial motions [DE 546-549] are **DENIED**.

**SO ORDERED.**

Dated: April 4, 2014

 s/ Philip P. Simon 
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

UNITED STATES OF AMERICA  )
            )
    v.       )  CAUSE NO: 2:10 CR 123
            )
WILLIE HARRIS     )
            )

## OPINION AND ORDER

Defendant Willie Harris was caught running a wide-ranging credit card fraud scheme. After a trial, he was convicted by a jury of two counts of identify theft, three counts of credit card fraud, aggravated identify theft, and conspiracy to commit fraud. Harris has now made four post-trial motions in anticipation of sentencing. First, he has moved for a judgment of acquittal, arguing that the evidence presented at trial was insufficient to connect him to the fraudulent acts alleged in Counts 4, 8, and 10 of the indictment [DE 546]. Next, he alleges the government violated Federal Rule of Criminal Procedure 11 by using evidence he provided in his proffer agreement against him in their case-in-chief [DE 547]. He has moved for the return of items that he claims were seized by the government and forfeited without his notice [DE 548]. And finally, he seeks an order compelling the government to produce evidence of the number of victims and loss amounts prior to his sentencing [DE 549]. For the reasons stated below, these motions are either without merit or moot. Accordingly, Harris's motions are **DENIED**.

## I. BACKGROUND

Harris was charged with participating in a credit card fraud conspiracy that lasted from March 2007 through January 2010 along with two counts of identity theft, three counts of credit card fraud, and one count of aggravated identity theft. Essentially, Harris and his co-conspirators were accused of obtaining the names and credit card numbers of victims and then impersonating

those victims in order to have their own names or aliases added as authorized users to the victims' credit card accounts. They then used these fraudulently obtained credit cards to make purchases, buy gift cards, and obtain cash advances and convenience checks on the victims' accounts. This was an extensive conspiracy, involving dozens of victims in twenty-three states and hundreds and thousands of dollars in losses.

The evidence adduced at trial established that Willie Harris was at the center of the conspiracy – directing the activities of several other co-conspirators. Although the fraudulent activity began in Indiana, after Harris was convicted of credit card fraud in state court, he moved the base of his operation to Georgia. Harris would fly his co-conspirators, mostly young women, from Indiana down to his home in Georgia and assist them in obtaining fraudulent Georgia identification. He would mail fraudulent credit cards to his co-conspirators in Indiana and Wisconsin and direct them to make cash advances on the cards. On a number of occasions, Harris flew to Indiana himself to assist with the transactions. Harris would drive the women from bank to bank, telling them how much money to request, sometimes even accompanying them to the counter as they requested the money.

Some of the government's most damning evidence included a series of recordings made by several credit card companies. These are the types of recordings customarily made by companies when customers call in for assistance. In these recordings, Harris poses as a real customer who is trying to convince the customer-service representative to add Harris's alias to the victim's account. Several of Harris's co-defendants testified that it was Harris's voice on those recordings. It is difficult to place into words just how compelling the recordings were and what they revealed about the true audacity of Harris's undertaking.

Five of Harris's co-defendants pled guilty and testified against him at trial. They all, more

or less, fingered Harris as the leader of this multi-state fraud ring which victimized dozens of people. On May 10, 2013, a jury found Harris guilty on all seven counts on which he was charged. Pursuant to Federal Rule of Criminal Procedure 29, he now challenges the guilty verdict on three of those counts.

## II. DISCUSSION

### A.    Motion for Acquittal on Counts 4, 8, and 10

Harris argues there is insufficient evidence linking him to Counts 4, 8, and 10 of the indictment. Federal Rule of Criminal Procedure 29 requires the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." However, "a defendant's burden in showing the evidence was insufficient to support a conviction is nearly insurmountable." *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008). A jury's guilty verdict will be set aside "only if the record contains *no evidence,* regardless of how it is weighed, from which a jury could have found the defendant was guilty." *Id.* (emphasis added). Put another way, the evidence must be "so scant that a jury could only speculate as to the defendant's guilt, and a reasonably minded jury must have had a reasonable doubt as to the defendant's guilt." *United States v. Howard*, 179 F.3d 539, 542 (7th Cir. 1999). In reviewing a motion for judgment of acquittal, I must view the evidence in the light most favorable to the government. *Rollins*, 544 F.3d at 835. It is not my job to play thirteenth juror, re-weigh the evidence myself, or second-guess the jury's assessment of the evidence. *Id.*

Counts 4, 8, and 10 all stem from a November 9, 2007 transaction where Tereza Harris, an unindicted co-conspirator, obtained an unauthorized $3,800 cash advance on the Citibank credit card of the victim with the initials BS. Based on this transaction, Count 4 charged Willie Harris with identity theft in violation of 18 U.S.C. § 1028(a)(7). Count 8 charged Harris with credit card

fraud in violation of 18 U.S.C. § 1029(a)(2). Count 10 charged Harris with aggravated identity theft in violation of 18 U.S.C. § 1028A. In the alternative, the government charged Harris with aiding and abetting these offenses in violation of 18 U.S.C. § 2.

To prove credit card fraud, the government had to show that Harris 1) knowingly used or trafficked in an unauthorized credit card; 2) obtained at least $1,000 in any one year period by doing so; 3) did so with the intent to defraud; and 4) affected interstate commerce. *See* Seventh Circuit Pattern Instruction for 18 U.S.C. §§ 1029(a)(2). The identity theft charges then build off of the credit card fraud. To simplify, a person commits identity theft if they use someone else's identification while attempting to commit credit card fraud, and a person commits aggravated identity theft if they use the identification to actually commit the credit card fraud. More specifically, to prove identity theft, the government had to show that a defendant 1) knowingly transferred, possessed or used the means of identification of another person; 2) knew that the means of identification belonged to another person; 3) acted with intent to commit or aid and abet credit card fraud; 4) acted without lawful authority; and 5) the transfer, possession or use of the means of identification affected interstate commerce or the means of identification was transported in the mail in the course of the possession or use. *See* Seventh Circuit Pattern Instruction for 18 U.S.C. § 1028(a)(7). For aggravated identity theft, the government had to prove that the defendant 1) committed the underlying felony offense of credit card fraud; 2) knowingly transferred, possessed or used a means of identification during and in relation to the offense; 3) did so without lawful authority; and 4) knew the means of identification belonged to another person. *See* Seventh Circuit Pattern Instruction for 18 U.S.C. § 1028A.

Willie Harris does not dispute that someone committed credit card fraud relating to the account of BS. But according to Harris, it was BS herself who was in cahoots with Tereza Harris,

4

meaning that BS was somehow involved in the theft of her own identity. Harris's testimony in this regard was nothing short of preposterous. BS testified; she is a older lady who lives outside the State of Indiana. She testified that she did know Tereza Harris and under no circumstances did she allow Tereza Harris to be added as an authorized user on her credit card. (Tr. V.2, p. 254-258). She testified that she was not involved in this fraud and felt victimized by those who stole her identity and added someone to her credit card as an authorized user without her knowledge or consent. *Id.*

BS's testimony and bank records plainly establish that someone used BS's identity to add Tereza Harris as an authorized user on BS's credit card accounts and then used those fraudulently-obtained credit cards, now in Tereza Harris's name, to rack up thousands of dollars in unauthorized charges (Tr. V.2, p. 253-267; Tr. V.7, p. 104, 122-123). As for the transaction that forms the basis for Counts 4, 8 and 10, BS's testimony, bank records, and a photograph show that on November 9, 2007, Willie Harris accompanied Tereza Harris to a bank in Munster, Indiana. While in the bank Tereza Harris used one of the fraudulently-obtained credit cards to get a $3,800 cash advance. (Tr. V.2, p. 254; Government's Exhibit 18).

Willie Harris argues that there was insufficient evidence connecting him to Tereza Harris's activities. In other words, there was *no* evidence in the trial record that he perpetrated, or at least aided and abetted, the fraudulent transaction on November 9, 2007. *Rollins*, 544 F.3d at 835. Harris has a significant burden, and he cannot meet it as there is plenty of evidence in the record connecting him to the transaction. Most obviously, Harris was right there at the scene of the crime. Harris says that he was just there as an observer and was only being nosey, yet he also testified that he knew Tereza Harris had a fraudulently-obtained credit card connected to BS's account (Tr. V.8, p. 106-107). And that he knew Tereza Harris intended to use the credit card to

5

get money off of BS's account (Tr. V.8, p 107).  In fact, the prospect of credit card fraud was Harris's stated reason for accompanying Tereza Harris into the bank. Here's what he testified to at trial in that regard:

Q:      Why is it that you were in the bank with her?

A:      I was just being nosey.

. . .

Q:      And why is that?

A:      I mean, it's a similar crime that I done before, so I was just with her.

(Tr. V.8, p. 107).

The most compelling evidence of Harris's complicity in the fraud involving BS's identity is Government's Exhibit 18 – a date-stamped photograph from a bank surveillance camera showing Willie Harris standing next to Tereza Harris as the bank employee handed out the cash. The photo appears to show Willie Harris grabbing, or at least with his hand on, the money.  This evidence has to be considered in light of co-defendant Lauren Price's testimony that Willie Harris and Tereza Harris were involved in credit card fraud schemes exactly like the one perpetrated on BS (Tr. V.6. p. 212-213).  And the days of testimony from government witnesses representing that Willie Harris was at the center of a credit card fraud conspiracy and had done what he was accused of doing with Tereza Harris with other co-conspirators at other banks.  Given all this, the jury had sufficient evidence to convict Harris on Counts 4, 8, and 10 of the indictment.

Perhaps because the photograph in Government's Exhibit 18 is so compelling, Harris makes a couple more arguments in his motion related to the photograph.  First he reiterates his argument at trial that the photograph should not have been admitted.  At trial, I ruled that the photograph easily met the standard for admissibility when considered in light of the testimony of

the victim and Lauren Price, and the documentary evidence (Tr. V.7, p. 121-23). As I explained, Harris's objections to the photograph, that the government was trying to convict Harris based only on a photograph, went to its weight, not its admissibility (Tr. V.7, p. 121). The photograph was highly relevant as it appeared to be a picture of Willie Harris and Tereza Harris at the bank at the time of the fraudulent transaction. *Id.* at 122. Further, the photograph was part of an exhibit that included the bank's transaction report showing the cash advance that was made on BS's account and photocopies of Tereza Harris's state ID and the credit card she used that were made by the bank at the time of the transaction. *Id.* Defendant Harris has not made any new arguments in his motion, so I see no reason to reconsider my ruling on the admissibility of the photograph.

Finally, the Defendant argues that the government falsely stated during its closing argument that the photograph showed Willie Harris attempting to take the cash from the bank teller. This appears to be a prosecutorial misconduct argument in the midst of the Rule 29 motion and it fails for several reasons. First, the government's statement was not improper or even false; it was a reasonable characterization of the evidence. It is not totally clear what is going on in the photograph, but it certainly appears as if Willie Harris is standing at the bank teller window, that there is cash on the counter, and Harris's hand is on top of the cash. Harris was free to, and did, argue for a different interpretation, but the government's description of what was going on in that photograph was fair.

Second, even if the reference was improper, it did not deprive Harris of a fair trial. *United States v. Simmons*, 581 F.3d 582, 590 (7th Cir. 2009) (noting that a court can dispose of the prosecutorial misconduct issue if it finds the prosecutorial remarks were not prejudicial). Any possible prejudice was minimized by the jury instructions. At trial, I instructed the jury that 1)

the lawyer's statements and arguments are not evidence; 2) that they could use common sense in weighing the evidence, consider the evidence in light of everyday experience, and make reasonable inferences based on the evidence; and 3) they could consider direct and circumstantial evidence and give it the weight they determined (Tr.V.9, p. 95).  So, Harris's final argument is without merit.

Accordingly, Defendants Motion for Court to Enter Judgment in Favor of Defendant on Counts 4, 8, and 10 [DE 546] is **DENIED.**

### B.      Motion for Relief for Government's Violation of Rule 11 Proffer Agreement

Harris argues that the government violated its Rule 11 proffer agreement by using evidence and information contained in the proffer against him in its case in chief.  Specifically, Harris says he told the government that Shannell Montgomery was an alias used by Alnese Frazier and Diontria Frazier and that the government turned around and used that information against him.  The government counters that, in the proffer agreement, Harris consented to their making derivative use of the information he gave, and that is all they did.  The government has the better argument.

A proffer agreement is considered to be a contract and therefore must be enforced according to its terms.  *United States v. Reed*, 272 F.3d 950, 954 (7th Cir. 2001).  In this case, the proffer agreement signed by Willie Harris explicitly provided for the government's derivative use of Harris's statements to the government.  The proffer agreement provides: "the government may make derivative use of, and may pursue investigative leads suggested by, any statements of information provided by your client's proffer." [DE 557-1 at 2].  Here the government used the information Harris gave them to track down the evidence that was introduced at trial.  For example, the government introduced Georgia DMV records relating to the alias Chanel

Montgomery (Govt Exhibit 104). Further, Alnese Fraizer testified that she used the Chanel Montgomery alias and that it was her picture on the Chanel Montgomery Georgia Driver's license (Tr. V.5, p. 116, 181). There is no question that agreements allowing for derivative use of information provided in proffers are valid and enforceable. *See, e.g., United States v. Wyner*, 230 F.3d 1368 (9th Cir. 2000) (holding government's derivative use of a defendants proffer was allowed under the express terms of the agreement); *United States v. Pielago*, 135 F.3d 703 (11th Cir. 1998) (concluding the government did not violate its proffer agreement by introducing testimony of a cooperative witness whose existence was revealed to the government during the defendant's proffer). And Harris has not shown that the government violated the terms of the agreement. Accordingly, the Defendant's motion [DE 547] is **DENIED**.

### C. Motion for Return of Items Forfeited

In his third motion [DE 548], Harris seeks the return of any items forfeited by him that the government seized without notice. He admits that he did receive notice in the indictment that the government was seeking forfeiture of up to $198,137.00 worth of property, but argues that the government never provided notice of the specific items of property that the government seized. In addition, Harris wants an inventory of all items seized by the government and any items returned to his authorized family member. Finally, he wants the government to return a thumb drive with music on it.

Federal Rule of Criminal Procedure 32.2 provides that a court cannot enter a judgment of forfeiture in a criminal proceeding unless "the indictment contains notice to the defendant that the government will seek the forfeiture." However, the indictment "need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks." F. R. Crim. P. 32.2(a). The indictment in this case, as Harris acknowledges, stated that

the government was seeking forfeiture.  That is all the notice Harris is entitled to.  Moreover,

Harris is being disingenuous when he claims that he didn't have notice of the items seized.  The

government has produced a letter from the United States Postal Inspection Service from way back

in October 2010 that inventoried all of the items seized from Harris's apartment and notified him

that these items were subject to forfeiture [DE 557-3].  I know Harris received the letter because

the government also produced a November 2010 letter from Harris in response that attached the

inventory and asked for the items back [DE 557-4].  So Harris's claim on this score is without

merit.

   As for his other objections, they are moot.  The government has provided the inventories

of items seized and the items returned to Harris's family member [DE 557-2 - 557-10] and

represents that it will return the thumb drive [DE 557 at11].  Accordingly, Defendant's Motion

for Return of Items Forfeited [DE 548] is **DENIED**.

### D.      Motion to Produce Evidence of Number of Victims and Loss Amounts

   Finally, Harris has moved for the government to produce evidence of the number of

victims and loss amounts prior to sentencing [DE 549].  I held a hearing on Defendant's

objections to the pre-sentence investigation report on February 27, 2014 [DE 563].  At that

hearing, the government produced the requested evidence.  Accordingly, Defendant's motion [DE

549] is **DENIED** as moot.

### CONCLUSION

   Defendant's four post-trial motions [DE 546-549] are **DENIED**.

**SO ORDERED.**

Dated: April 4, 2014

                                      <u>s/ Philip P. Simon</u>
                                      PHILIP P. SIMON, JUDGE
                                      UNITED STATES DISTRICT COURT