2                    UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF INDIANA
3                      HAMMOND DIVISION

4

5   UNITED STATES OF AMERICA,          )
                                       )
6                    Government,        )
                                       )
7   VS.                                ) Cause:    2:10 cr 123
                                       )
8   WILLIE HARRIS,                     )
                                       )
9                    Defendant.        )

10

11

12          The CONTINUED SENTENCING HEARING   in the above-entitled
    matter was commenced before Honorable   Philip P. Simon, Chief Judge
    of said court, at the Federal Building, 5400 Federal Plaza,
13  Hammond, Indiana, on the  4TH day of April, 2014 commencing at the
    hour of  10:30 in the  forenoon.

14

15

16

17

18

19

20

21          Sharon Boleck Mroz, CSR, RPR, CPE
            Official Court Reporter
22          US District Court
            Northern District of Indiana
23          Hammond Division
            5400 Federal Plaza
24          Hammond, IN 46320
            (219) 852-6728
25

1                        Appearances:

2                   Ms. Toi Denise Houston
                    Office of the United States Attorney
3                   5400 Federal Plaza,  Ste 1500
                    Hammond, IN  46320
4
                              On behalf of the  Government;
5
                    Mr. Arlington J.  Foley
6                   Attorney At Law
                    1942 North Main Street
7                   Crown Point, IN  46307

8                              On behalf of the Defendant.

9                   Defendant present in person.

10
                    Also present:    Cecil Frink, Postal Inspector
11                                   Mary Johnson, Postal Inspector
                                     David Beier, Probation.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX

2    Inspector Cecil Frink

3           Houston - Direct ----------------------------20
            Foley - Cross--------------------------------32
4           Houston - Redirect---------------------------40
            Foley - Recross------------------------------43
5           Houston -Redirect----------------------------46

6    Melanie Thompson
            Houston -Direct------------------------------60
7           Foley - Cross--------------------------------61

8    Willie Harris
            Foley- Direct--------------------------------67
9
     Sentence imposed ----------------------------------100

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sharon Boleck Mroz, CSR, RPR, CPE
5400 Federal Plaza, Suite 4400
Hammond, IN  46320  (219) 852-6728

1                         EXHIBITS

2        Government's

3                Amended Ex C--------------------------------------21
                 D--------------------------------------------23
4                E--------------------------------------------26
                 F--------------------------------------------27
5                G1 and G2------------------------------------30
                 H--------------------------------------------31

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sharon Boleck Mroz, CSR, RPR, CPE
5400 Federal Plaza, Suite 4400
Hammond, IN  46320 (219) 852-6728

1           THE CLERK: All rise.

2           THE COURT:  All right.  You can be seated.

3           All right.  We are on the record in United States versus

4    Harris, 2:10 CR 123.  This is a continuation of the sentencing

5    hearing that we began a few weeks ago.

6           We ended that evening around 5:30, and there was still a

7    few issues outstanding, so, I continued it to today's date.

8           Mr. Harris is present with his lawyer, Arlington Foley.

9    Toi Houston is here for the Government.  Just if you would state

10   for the record your agents that are here with you.

11          MS. HOUSTON: Yes, Your Honor.

12          Supervisory Inspector Cecil Frink  from the United States

13   Postal Inspection Service and Inspector Mary Johnson.

14          THE COURT:  All right.  So, when we left off last -- I

15   believe there were still two issues for me to decide relating to

16   the Sentencing Guidelines, and I still hadn't considered both

17   sides' request for non-guideline sentences.

18          So, those are the issues that I think were remaining.  In

19   the meantime, the Government has filed a motion asking me to

20   reconsider one of the earlier rulings that I made relating to the

21   number of victims.

22          So, if I choose to reconsider that, that leaves three

23   issues that need to be decide as it relates to the Sentencing

24   Guidelines before we get to the 3553 A factors portion of the

25   sentencing hearing.

1          Do you agree with that, Mr. Foley?

2          MR. FOLEY:  Yes.  I would like to comment if I'm given

3   the opportunity.

4          THE COURT:  Comment on --

5          MR. FOLEY:  On the conduct of the hearing, the manner in

6   which it should be conducted today, at least the way I understand

7   it and the way things have developed since the last hearing, and

8   including the Government's motion to reconsider.

9          THE COURT: Okay.  Well, what I'm asking, is that the

10  universe of issues that are presently before me as it relates to

11  the Sentencing Guidelines.  One is the amount of the loss, which we

12  still hadn't decided because you had requested additional time to

13  consider that issue.

14         MR. FOLEY:  Yes.

15         THE COURT:  The second one was whether or not this prior

16  conviction that's represented in paragraph 72, you know, is valid

17  or not.

18         You raised it as an objection at the last hearing orally.

19  It wasn't in the presentence report.  So, that issue is to be

20  decided, and then I'm just laying out on the table the Government's

21  also filed a motion to reconsider, and I'm going to hear from you

22  on that --

23         MR. FOLEY:  Right.

24         THE COURT:  -- as it relates to the victim adjustment.

25         What I'm asking right now, is there any other issues from

1  a guideline perspective that I need to decide that I haven't
2  already resolved?
3           MR. FOLEY:  May I answer that without a yes or no answer?
4           THE COURT:  Sure.
5           MR. FOLEY:  It's only because -- I don't want to confuse
6  anything, make things any more complicated than they already have
7  been.  As you know, Mr. Harris and I have had our differences
8  during the course of this entire lengthy proceeding.
9           And my belief is I agree with the Court, 100 percent,
10 that -- however, I do not agree that the Government -- that the
11 Government's motion should be reconsidered by the Court at all.
12          THE COURT:  Okay.  We'll get to that.
13          MR. FOLEY:  I understand.  But my client is asking me to
14 do some things that I don't believe are appropriate just as I don't
15 think that the Government's motion for reconsideration is
16 appropriate, only because in my mind, certain issues were closed,
17 evidence was heard and we were done.
18          And then we came in here today for a couple of limited
19 items, and then couple of arguments and sentencing.
20          And I don't want to reopen other things, but my client's
21 asking me to, and that would dictate filing other motions and
22 coming back for other hearings.
23          THE COURT:  I'm not doing that.
24          MR. FOLEY:  I understand, and I --
25          THE COURT:  What -- it's your obligation to file what you

1    think is appropriate, Mr. Foley. Period. If you don't think it's

2    appropriate, then you ought not file it.

3           If you think it is, then you should. I'm not going to

4    tell you what to do.

5           MR. FOLEY: I understand. And I'm just putting that on

6    the record to let the Court know where I'm coming from and yes, I

7    agree with the Court, I do with that caveat.

8           THE COURT: Miss Houston.

9           MS. HOUSTON: Yes, Your Honor, the loss amount, the prior

10   conviction, the Government's motion to reconsider, and I believe

11   that the Court said with respect to the use of a minor that you

12   would take it under advisement under 3553 A.

13          THE COURT: Yeah, I already ruled on the issue. I found

14   in favor of the Government, but I think I stated at the time that

15   it made no sense to me, given the circumstances of this case, but

16   that's a 3553 A --

17          MS. HOUSTON: I agree with you.

18          THE COURT:   -- issue.

19          MS. HOUSTON: I agree with you, Your Honor.

20          THE COURT: Is there any other evidence that you wish to

21   present as it relates to the amount of the loss. I think it was

22   your contention that the amount of the loss, and it's been

23   supported with these charts that you have filed, that it's roughly

24   $306,000 or in that range. And the cut-off under the guidelines is

25   somewhere below 200,000. So, Mr. Foley, you had asked for

1   additional  time to see if you wanted to  present  any evidence  to me

2   that would  persuade  me that the  amount  of the loss  is below that

3   next level.

4          MR. FOLEY:  I don't  have in any additional  evidence  to

5   present  to get it below 200,000.  It would be impossible  to do

6   that.

7          THE COURT:  All right.  So, is there anything  else you

8   wish to present  then, Miss Houston?

9          MS. HOUSTON:  No.  With respect  to that, Your Honor, I

10  just wanted to point out that we did in the amended  sentencing

11  Exhibit A, leave highlighted in yellow under  the American Express,

12  that there were  three figures  that needed  to be redacted  or cut

13  out, and I'm going to do that right now.  And I gave you the figure

14  last time, because Inspector  Frink testified those three figures

15  were double counted,  but it's still  over the dollar amount  that

16  would allow that enhancement.

17         So, the actual  dollar amount -- it was $306,205.68.  And

18  $3,669 -- if you give me an opportunity I'm going to subtract that

19  right now.  We had done that before and provided that, but I don't

20  have that off the --

21         THE COURT:  The point is that it's well over 200,000.

22         MS. HOUSTON:  Well over 200,000.

23         THE COURT:   Correct.

24         Okay.  Anything  else that -- Miss Houston?

25         MS. HOUSTON:  No, Your Honor, not with respect to the loss

1    amount.

2          THE COURT:  I have on my desk here, new Government

3    Exhibits.  What do these relate to?

4          MS. HOUSTON: Some of them are exhibits -- I wanted to

5    give a complete packet.  I have given one to the Court.  Some of

6    them relate to the Government's motion to reconsider the number of

7    victims, but some of them are exhibits that have already been

8    entered.  I wanted to make sure everybody had a complete packet.

9          So, Government's Exhibit, Amended Exhibit A and

10   Government's Exhibit B and C have already been entered into

11   evidence or filed with Government's motions.  The remaining

12   exhibits, Amended C through H just reference the Government's

13   argument relating to the number of victims.

14         THE COURT:  All right.  We'll talk about that when we

15   discuss that issue, but for now, the objection as to the amount of

16   loss is overruled.

17         I think the evidence is really overwhelming based on the

18   evidence at trial and what was presented at the earlier sentencing

19   hearing that the amount of the loss is somewhere well north of

20   $200,000 in this case.

21         And that is the cutoff for the next loss figure.

22         So, under 2 B 1.1 B 1 G, you have to add 12 to the

23   offense level for the amount of the loss.  That's if the loss is

24   somewhere between 200,000 and 400,000.  And the loss here is

25   roughly $300,000.

1          And that's well supported by the evidence  presented  by

2    Inspector Frink at the last hearing as well as  the  evidence

3    presented at the trial and in the absence of any evidence to the

4    contrary from the Defendant. I find that to be credible, and

5    that's the amount of the loss that I am finding.

6          Okay.  The next issue deals with -- Mr. Harris filed an

7    objection orally at the last sentencing hearing, and that dealt

8    with paragraph 72 of the -- of the presentence report.

9          And paragraph 72 deals with a prior conviction that Mr.

10   Harris has sustained, or it is alleged that he sustained back in

11   2008.  So, I think, Mr. Foley, you wanted an opportunity  to look at

12   some of the records and to see if that -- if that is a bonafide

13   conviction and whether it should be includable under the criminal

14   history computation, is that right?

15          MR. FOLEY:   Yes, Your Honor.

16          THE COURT:   All right.  So, I'll hear from you on that

17   issue.

18          MR. FOLEY:   Since the last hearing, Mr. Beier provided

19   probably to the Court as well, I am assuming, a document file

20   marked February 24, 2011 from Judge Cantrell's Court, Lake County

21   Court, Lake Superior Court County Division 3 in Crown Point.

22          And I after reviewing that, I have to agree with

23   probation, although my client doesn't, that he was convicted.  In

24   paragraph 4, it says that conviction of Class B felony stand, the

25   Defendant be sentenced to one day, Lake County jail, credit for

1    time served.

2         At the bottom it's agreed by both prosecution and the

3    defense attorney Mr. Fontinez (phonetic) and signed by the Judge

4    under a sentence that says "granted and so ordered."

5         To me, that is a conviction and sentence, so, I have to

6    withdraw that objection although my client --

7         THE COURT:  All right.  Then -- then that objection is

8    going to be shown as withdrawn.  This -- it's clear that he's got a

9    prior conviction.

10        What the document says, and I'm going to order that the

11   document be included as part of the record in this case.

12        So, Miss Houston, if you would, just approach the bench.

13        MS. HOUSTON: Yes, Your Honor.

14        THE COURT:  And I'm going to ask that you mark this

15   exhibit so that it's made part of the record.

16        MS. HOUSTON: Thank you, Your Honor.

17        (Government marking document.)

18        MS. HOUSTON:  Your Honor, I have marked it as

19   Government's Exhibit I.

20        THE COURT: Okay.  Any objection to I, Mr. Foley?

21        MR. FOLEY:  Your Honor, I'm -- is "I" one of the exhibits

22   that was given to me today?

23        THE COURT:  Yes.  This is what Mr. Beier had previously

24   presented to your office.  I just want it made part of the record.

25        MR. FOLEY:  That's what I saw, I'm sorry.  I thought it

1    was something else.  I'm sorry.

2         No, I have no objection.

3         THE COURT:  So, Government's Exhibit I is an agreed

4    sentence stipulation entered into between the State of Indiana and

5    Willie J. Harris, and what it essentially says is that Mr. Harris

6    -- there was a bench trial held on December 18, 2008 on a

7    misdemeanor charge of harassment.  It was a Class B misdemeanor.  He

8    was found guilty.  And the parties stipulated to a one day jail

9    sentence to be given -- to be served in the Lake County jail.  And

10   the reason it was a stipulated sentence was because in the

11   meantime, the Defendant was indicted in this case.

12        So, essentially, the state authorities arrived at an

13   agreed sentence, and the matter then was closed, but this agreement

14   is -- as to the sentencing, was signed by Judge Cantrell of the

15   Lake Superior Court.

16        It was ordering the sentence imposed, and it's a prior

17   conviction, and it's really that simple.

18        So, I think Government's Exhibit I supports what is

19   contained in paragraph 72.  As a result there is one criminal

20   history point for the Defendant having been found guilty at that

21   bench trial and being sentenced for that crime of harassment.

22        So, the objection has been withdrawn.  If it wasn't

23   withdrawn, I would have overruled it.

24        All right.  So, the last issue is whether we should -- I

25   should reconsider the victim adjustment in this case.

1          Miss Houston, let's talk about whether I should

2    reconsider it.  I mean, it's -- ordinarily, it's not a chance for

3    do over.  At the last hearing, you conceded that the victims were

4    somewhere between 10 and 50, and by circumstances of this case,

5    having -- the sentencing having been continued, you're now asking

6    me to reevaluate that.  Why should I do that.

7          That's sort of getting at the procedural question that

8    Mr. Foley is raising.  Let's talk about that first.

9          MS. HOUSTON:  Your Honor, under the Crime Victim Rights

10   Act and the Victim Restitution Rights Act, and Mandatory Victim

11   Restitution s Act, the Government is obligated to present to the

12   Court the number of victims.  And while the guidelines are

13   advisory, under -- as I stated in my motion to reconsider, under

14   the Sentencing Guidelines, Section 2 B 1.1 B 2 B, Application Note

15   4 E, it defines victims differently.

16          In identity theft cases, the Congress and the Sentencing

17   Guidelines have gone beyond in order to identify identity theft

18   victims.  In this case, it's the means of identification.  And what

19   was presented to the Court originally was a list of the authorized

20   users with the amended sentencing exhibit that I have presented to

21   the Court --

22          THE COURT:  Before we get into the substance of it --

23          MS. HOUSTON: Okay.

24          THE COURT:  -- let me --

25          MS. HOUSTON: I'm sorry.  The main reason that the

1    Government feels that the Court can and should reconsider it is

2    because of the laws that require us to present to the Court the

3    victims who are associated with that case.  The victims that were

4    identified and that the Government agreed were victims last -- at

5    the last sentencing hearing, didn't incorporate those victims whose

6    means of identification was utilized even though there was no loss

7    sustained.

8                THE COURT:  I understand.  I understand.

9                MS. HOUSTON:  So, that's --

10               THE COURT:  At the last sentencing hearing, I was unaware

11   of Application Note 4 E.  I think that's where the disconnect was.

12   And I don't think you called it to my attention either.

13               MS. HOUSTON:  I didn't.

14               THE COURT:  But you have now in your Motion To

15   Reconsider.

16               MS. HOUSTON:  That's correct, Your Honor.

17               THE COURT:  Mr. Foley, let's talk about process first

18   before we get into the argument itself.

19               You know, I -- if I find that I made an error, why can't

20   I correct the error.  What's wrong with that?

21               MR. FOLEY:  Well, first of all, Your Honor, I have --

22   there is nothing wrong with doing that.

23               However, obviously, there is an interest in finality in

24   any legal proceeding.  Had we done the entire sentencing the last

25   time, which we didn't of course, this issue would be moot.

1          We were -- we were given the opportunity, the Government

2     as well as myself, to present any evidence on any issue with regard

3     to pending motions especially with regard to the sentencing

4     guideline calculation that the Court was ultimately going to make.

5          When I left the last hearing, I was confident that we

6     were done with evidence.  We were done with arguments pertaining to

7     the guideline calculation.  The Government files, you know, at the

8     eleventh hour a motion asking for reconsideration of what the Court

9     had already ruled upon.

10          Now, I understand the Court wasn't aware of Application

11     Note whatever it is, 4 or whatever it is.

12          THE COURT:   4 E.

13          MR. FOLEY:   I'm sorry.  And the Court had made a ruling

14     based upon, number one, the evidence presented, and number 2, the

15     arguments of the parties as well as the Court's own research.

16          At that time what the Court had -- you know what your

17     decision was.  It was based upon more actual or intended victims as

18     opposed to what the Government is arguing in its motion.

19          I thought that was a well reasoned and good conclusion to

20     come to, obviously, on my client's behalf.  And as I indicated, the

21     evidence was presented, the arguments were presented, and now the

22     Government is, without getting into the substance of the motion,

23     presenting a handful of documents to substantiate a different type

24     of argument.

25          If, in fact, we are going to go down that road, that's

1    like reopening the hearing evidentiarly if the Court accepts these

2    exhibits, and now, in my opinion, I would have to request since I

3    got a handful of stuff today, a continuance to reexamine this

4    stuff.

5            We've had a trial.  We've had a hearing that was supposed

6    to dispose of all of these motions.

7            And my opinion I want to see Mr. Harris get sentenced.  I

8    think the Court's opinion was well reasoned, and I believe based

9    upon the evidence previously presented to this Court that the Court

10   made the right ruling.

11           Now, you're being asked to evaluate something based on

12   new evidence, evidence that hasn't been previously submitted to the

13   Court.

14           They had their opportunity.  If they didn't submit the

15   proper evidence at that time, that's it.  It's over.

16           THE COURT:  All right.  Miss Houston.

17           MS. HOUSTON: First of all --

18           THE COURT:  Is this new evidence --

19           MS. HOUSTON: No, your Honor.

20           THE COURT:  -- that you intend to offer?

21           MS. HOUSTON: This is a summary of the -- without going

22   into it, the motion that I filed identifies the victims.  Inspector

23   Frink would testify as to the trial exhibits that were admitted to

24   support those.

25           So, it's not new evidence.  It's already been introduced

1    into -- at trial.  So, there are --

2            One moment, your Honor.

3            There are four -- five supporting documents that were not

4    initially introduced at trial, but even excluding them, we still

5    get over the 50 victims.  And those 50 plus victims, the evidence

6    supporting that was -- is based upon evidence that was introduced

7    at trial.

8            So, there is no new evidence being introduced, if we

9    exclude the supporting documents that Inspector Frink would testify

10   to support some of these victims.  But the 50 plus victims is based

11   on exhibits that were already introduced at trial.

12           We just compiled them to show that these are victims who

13   are identified in the trial exhibits and during the trial.  And as

14   I previously argued, Your Honor, under the CVRA the VRRA and the

15   Mandatory Victim Restitution Act, they have taken into

16   consideration that identity theft victims are a different victim

17   and expanded the definition of what a victim is.

18           So, if you only look at Amended C exhibit, then -- which

19   is just adding so that Inspector Frink, he could say, these are the

20   supporting documents that were admitted at trial, you still have

21   over 50 victims.

22           THE COURT:  All right.  I'm going to allow her to present

23   this.  I approached this incorrectly from a legal perspective.  I

24   don't believe there is really any new evidence being presented

25   here.  It's just being argued in a different way, arguing a

1    different legal point.

2           So, present whatever you want to present on the issue,

3    Miss Houston.

4           MS. HOUSTON:  Your Honor, I call Inspector Frink.

5           THE COURT:  All right.  Sir, come on forward please.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

20

```
1                    INSPECTOR CECIL FRINK
2  called as a witness by the  Government , being first duly sworn to
3  testify the truth, the whole truth, and nothing but the truth, was
4  examined and testified as follows:
5                DIRECT EXAMINATION BY :
6                MS.  HOUSTON:
7  Q    Inspector Frink, could you state your name  for the record ,
8  your title  and the agency for  whom you're currently  employed ?
9  A    Cecil Frink.  F R I N K.
10           I'm a US Postal  Inspector , team leader.
11 Q    And prior to your  testimony  today, did you have  an opportunity
12 to look at Government's  Exhibit Amended C?
13 A    Yes.
14 Q    What is Government's  Exhibit  Amended C?
15 A    That is a list of the victims that were identified  earlier,
16 and I went back, had an opportunity  to go through  all exhibits
17 presented during  trial and added exactly what exhibit, the trial
18 exhibit  each victim was listed on.
19 Q    And you did this this week , didn't you?
20 A    Yes, a couple days ago.
21 Q    And on your list, you have how many  individuals -- how many
22 individuals and or entities  identified  as victims?
23 A    69.
24 Q    And looking at Government's  Exhibit  C, there were  six
25 additional  individuals  and or entities  added, is that correct?
```

1    A     Yes.

2    Q     And that's why Amended C is presented today, is that correct?

3    A     Yes.

4    Q     Who were the additional individuals that were added?

5    A     There were four people that I found on an American Express

6    Exhibit.  Last name Whittie.  Taylor, Goldstein, Wobble and Shaw, I

7    believe.

8          Not Whittie, but the Taylor, Goldstein, Wobble and Shaw.

9    Q     What were the additional entities or corporations that were

10   added?

11   A     Apple and Best Buy.

12         MS. HOUSTON:  Your Honor, the Government would like to

13   substitute -- would like to enter into evidence amended sentencing

14   Exhibit C.

15         THE COURT:  All right.  Any objection Mr. Foley?

16         MR. FOLEY:  Yes, Your Honor until I've had a chance to

17   cross-examine the witness on each and every item that's been

18   entered here, I don't know that it's -- foundation.

19         THE COURT:  Overruled.  Amended C is admitted.  You can

20   cross-examine him on the contents of the exhibit.

21         (Whereupon, evidence previously marked

22         Government's Amended Exhibit C

23         Was admitted in evidence.)

24         MS. HOUSTON:

25   Q     Looking at Government's Exhibit D for sentencing, Inspector

1    Frink, what is Government's  Exhibit D?

2    A    D is a spreadsheet  from Chase Bank from Diane Henn.

3    Q    And she is the regional  investigator  for Chase?

4    A    Yes.

5    Q    JP Morgan  Chase?

6    A    Yes.

7    Q    Just for clarification , Washington  Mutual  is part of Chase

8    now, is that correct?

9    A    Yes.

10   Q    So if Washington  Mutual  is referenced  in anything, it's part

11   of Chase?

12   A    Correct.

13   Q    Now, exactly  what is -- how does Government's  Exhibit D equate

14   to Amended  C with respect to  Daryl  Watkins ?

15   A    Couple  of the victims  that were listed on Amended  C and on C

16   when we went back through  all the trial  documents , their names were

17   not listed  in the trial  documents , but they have been listed as

18   victims.   And when I went back through  the -- my records, the -- I

19   got the names  from a spreadsheet  that Diane Henn had sent me when

20   the investigation  started, reference  Darriell  Watkins.

21   Q    So, with respect to the -- looking at Amended  C, Alexander  and

22   Bender  who are number 3 and 4, and also number  30,

23   Mahlke,  M A H L K E, that's all from this Government's  Exhibit D,

24   is that correct?

25   A    Yes.

1   Q    That is how those victims were identified?

2   A    Yes.

3   Q    What was Darriell Watkins with respect to -- was she an

4   authorized user?

5   A    Yes, she was added as an authorized user to each of those

6   individual's accounts.

7   Q    And Miss Henn advised that they were compromised accounts?

8   A    Yes.

9           MS. HOUSTON:  Your Honor, the Government would like to

10   enter into evidence Government's Exhibit D.

11           THE COURT:  Any objection?

12           MR. FOLEY:  Was that D?

13           MS. HOUSTON:  D as in David.

14           MR. FOLEY: No objection.

15           THE COURT:  All right.  D is admitted.

16           (Whereupon, evidence previously marked

17           Government's Exhibit D

18           Were admitted in evidence.)

19           MS. HOUSTON:

20   Q    Now, with respect to D, you have Mister -- you have Joan

21   Wheeler and Kevin Wheeler.  What was the connection on that with

22   Exhibit D with the Wheelers?

23   A    I believe Miss Henn found that through the phone numbers that

24   had called in to Chase.

25   Q    What was the phone number?

1   A       (404) 567-2322 .

2   Q       And your investigation  revealed  that  that number had what

3   connection to this case?

4   A       That phone number had access to a couple accounts and that was

5   the phone number that Mr. Harris called Munster PD Detective from.

6   Q       Is that detective Mike Janiga?

7   A       Yes.

8   Q       Is that referenced in Detective Janiga's report?

9   A       Yes, I believe so.

10  Q       With respect to Government's Exhibit E, what is that?

11  A       That's another spreadsheet that I had received from Miss Henn,

12  and I had listed the individuals on this sheet as victims.  And one

13  of the individuals, I believe, was not entered into the trial

14  exhibits.

15  Q       Is that number 5, B O H L?

16  A       Yes.

17  Q       Is that George Bohl?

18  A       Yes.

19  Q       And there are other victims whose information was introduced

20  at trial on Government's Exhibit E. Is that correct?

21  A       Correct.

22  Q       And the supporting or trial exhibits associated with them are

23  contained within Government's Exhibit Amended C, correct?

24  A       Correct.

25          THE COURT:  I don't see where you're referencing.

1            MS. HOUSTON: I'm sorry.

2            THE COURT:  On E.

3            MS. HOUSTON: Look at the -- on Government's Exhibit E,

4    it's the last name.

5            THE COURT:  Oh, I see.  I got it.

6            MS. HOUSTON:   Where it says George Bohl.

7            THE COURT:  The very bottom of the page.

8            MS. HOUSTON:

9    Q    Is that correct, Inspector Frink?

10   A    Yes.

11   Q    And it provides -- is there another connection there with this

12   case in terms of the address?

13   A    Those all went to the 4447 address in Gary.

14   Q    And is that one of the addresses that came up during the

15   course of the trial?

16   A    Yes.

17           MS. HOUSTON:   And, Your Honor, with respect to

18   Government's Exhibit E, not only would we like to enter it into

19   evidence, but I noted that part of the account numbers haven't been

20   redacted, and I'd like to redact that before it's actually part of

21   the record.

22           THE COURT:  Any objection to E?

23           MR. FOLEY: No.

24           THE COURT:  All right.  It's admitted and it can be

25   redacted, the account numbers.

1

2              (whereupon, evidence previously marked

3              Government's Exhibit E

4              Was admitted in evidence.)

5              MS. HOUSTON:

6   Q    I would like you to look at Government's Exhibit F.  Which

7   victim is this in reference to?

8   A    Randall Borgman.

9   Q    Mr. Borgman actually testified at trial, is that correct?

10  A    Correct.

11  Q    And what are these records in reference to?

12  A    These are reference to a -- when we did a search warrant in

13  Atlanta, when we recovered a Chase credit card and an ID in the

14  named of Jarod Moore, the Chase credit card had the name of Jarod

15  Moore.  And once I contacted Diann Henn to ask who account that

16  card was associated with, these are the documents she faxed back to

17  me that they were associated with Randal Borgman.

18  Q    Just so we are clear with respect to Government's Exhibit F,

19  on the fourth page, it actually gives the last four numbers of that

20  credit card number, is that correct?

21  A    Yes.

22  Q    And what are the last four numbers?

23  A    1292.

24  Q    1292?

25  A    Yes.

1   Q    And then when you turn to the next page, does it provide

2   Randall Borgman's name?

3   A    Yes.

4   Q    Does it also have the 1292 account number?

5   A    Yes.

6   Q    And then when you turn to the next page of that document, it

7   also has Mr. Borgman's name and the account number ending in 1292

8   in the upper right hand corner?

9   A    Yes.

10          MS. HOUSTON:   Your Honor, the Government would ask to

11   enter into evidence Government's Exhibit F.

12          THE COURT:   Any objection?

13          MR. FOLEY: No, your Honor.

14          THE COURT:   All right.  F is admitted.

15          (whereupon, evidence previously marked

16          Government's Exhibit F

17          Was admitted in evidence.)

18          MS. HOUSTON:

19   Q    I'd like you to look at Government's Exhibit G 1.

20   A    Okay.

21   Q    What is G 1?

22   A    These are complaints filed with the US Postal Inspection

23   Service.

24   Q    And I'll have you look at -- so, is G 1 and G 2, are they the

25   same?

1    A    No, they are two different complaints.  One from a Howard
2    Tessler and one from Stephen Sandon.
3    Q    G 1 is Mr. Tessler?
4    A    Yes.
5    Q    And in G 1, in summary, what is he saying?  What is this
6    complaint?
7    A    Somebody in Georgia by the name of Katrina Thompson used his
8    credit card.
9    Q    Does he say Chase Visa, Citibank Mastercard, Discover and Bank
10   America Visa?
11   A    Yes.
12   Q    And this is a two page document, correct?
13   A    Yes.
14   Q    And on the second page, it references an account number, is
15   that correct, at the bottom?
16   A    Yes.
17   Q    And it's a Bank of America account?
18   A    Yes.
19   Q    Ending in what?
20   A    6688.
21   Q    And this is a -- this theft complaint is a document in the
22   regular course of business by the US Postal Inspection Service, is
23   that correct?
24   A    Correct.
25   Q    With respect to G 2, that is -- you said Stephen Sandon

1    S A N D O N?

2    A    Yes.

3    Q    Is this also a Bank of America account?

4    A    Yes.

5    Q    What does it end in?

6    A    4178.

7    Q    And does it indicate in Mr. Sandon in G 2, who was added as

8    the -- who compromised his account?

9    A    It says that Robert Sanders.

10   Q    Under the word "suspects"?

11   A    Yeah, it says "address changed through Robert Sanders."

12   Q    And just so -- and it indicates Mr. Sandon is a resident of

13   Florida, correct?

14   A    Correct.

15   Q    Mr. Tessler is a resident of Illinois?

16   A    Correct.

17        MS. HOUSTON:  Your Honor, the Government would ask --

18        MS. HOUSTON:

19   Q    And these two individuals are identified as victims on Amended

20   C, correct?

21   A    C and -- C and Amended C.

22        THE COURT:  All right.

23        MS. HOUSTON:  Your honor, the Government requests

24   permission to enter into evidence G 1 and G 2.

25        THE COURT:   Any objection?

1          MR. FOLEY: No, your Honor.

2          THE COURT:  All right.  They are both admitted.

3          (Whereupon, evidence previously marked

4          Government's Exhibit G 1 and G 2

5          Were admitted in evidence.)

6          MS. HOUSTON:

7    Q    Finally, looking at Government's Exhibit H, this is the

8    timeline date order, added authorized user list?

9    A    Yes.

10   Q    And you testified utilizing this document at trial, is that

11   correct?

12   A    Correct.

13   Q    With respect to  this, this only reflects individuals who were

14   added as authorized users?

15   A    Correct.

16   Q    But it doesn't preclude the individual where they actually

17   made purchases to?

18   A    Correct.

19   Q    This is based on loss amounts only?

20   A    No.  These are just the accounts where we knew who exactly had

21   been added as authorized user.

22   Q    And the names on Government's Exhibit H is also reflected in

23   Amended C, correct?

24   A    Yes.

25          MS. HOUSTON :  Your Honor, the Government would request

1     permission to enter into evidence Government's Exhibit H.

2                    THE COURT:   Any objection to H?

3                    MR. FOLEY:   No.

4                    THE COURT:   All right.  It's admitted.

5                    (whereupon, evidence previously marked

6                    Government's Exhibit H

7                    Was admitted in evidence.)

8                    MS. HOUSTON:

9     Q    Inspector Frink, with respect to looking at Amended C, number

10    55, is J Wheeler which we have identified as Joan Wheeler.  That's

11    based on the spreadsheet, correct, of Darriell Watkins?

12    A    Yes.

13    Q    Which would be Exhibit D.  And then the -- with respect to

14    victim number 45, Mr. Sandon that's based on the mail theft

15    complaint, G 2, correct?

16    A    Correct.

17    Q    And with respect to Mr. Tessler, that's based on Government's

18    Exhibit -- which is number 51, that's based on G 1, correct?

19    A    Correct.

20    Q    And then under 49, that's Jeff Suvas Chand, and he actually

21    testified at trial, is that correct?

22    A    Correct.

23    Q    And a number of these individuals who are identified as

24    victims, at least 15 of them or more, testified at the trial too

25    that their accounts had been compromised?

1    A    Yes.

2         MS. HOUSTON: I have no further questions, your Honor.

3         THE COURT:   All right.   Cross.

4

5         MS. HOUSTON: And, Your Honor, the Government would ask

6    that Exhibit 271 A on our motion be stricken because we determined

7    that that exhibit was not entered into evidence.

8         THE COURT: Okay.  Very well.  I'll show it stricken.

9         CROSS-EXAMINATION BY:

10        MR. FOLEY.

11   Q    You have the exhibits before you?

12   A    Yes, sir.

13   Q    Copies of them.

14        I believe it's Exhibit C?

15   A    Yes, sir.

16   Q    The individuals listed on Exhibit C, there is a total of 63?

17   A    Yes.

18   Q    Of those -- those entities or individuals located -- listed on

19   Exhibit C, several of them are businesses, is that correct?

20        And I'm referring you basically to the bottom, the last

21   number of them, starting with 63 and working our way up, Sun Trust,

22   that is a business, is that correct, a bank?

23   A    Yes, sir.

24   Q    And Gucci, that is a business?

25   A    Yes, sir.

1 Q Harris Bank, that's a bank?

2 A Yes.

3 Q Discover card is a credit card company?

4 A Yes.

5 Q Citibank same thing?

6 A Yes.

7 Q Chase Bank same --

8 A Yes.

9 Q American Express the same?

10 A Yes.

11 Q So, the last one, two, three, four, five, six, seven  of those

12 are not individuals, but they are businesses, is that correct?

13 A Correct.

14 Q Are there any other businesses listed on Exhibit C or is that

15 it?

16 A When I completed Amended C, I added Apple and Best Buy.

17 Q Okay. Now, the testimony at trial, you were here during the

18 whole trial, right?

19 A Yes, sir.

20 Q And the testimony at trial was that as far as actual losses

21 go, that the actual monetary losses were sustained by the

22 businesses, is that right?

23 A Yes, sir.

24 Q That none of the individuals who had their credit cards or

25 identities in any way compromised had lost anything of a monetary

1   value, is that right?

2   A    Yes, sir.

3   Q    Is that true for -- also for the people that -- if I remember

4   correctly, the last time we were here, there was an exhibit, I

5   believe an Exhibit A that was submitted regarding actual and

6   intended losses?

7   A    Correct.

8   Q    And the actual losses, I believe there was about 20 some

9   victims that were listed?

10   A    I'm not exactly sure the exact number, but yeah.

11   Q    But a lot less than 63, it was more like 20 some, 30 some,

12   something like that?

13   A    Yeah.

14   Q    Since then we have added a whole bunch more because of the

15   motion to reconsider, is that correct?

16   A    I don't know if it was because of that, but I know I had

17   presented -- given the US Attorney all of these victims prior to

18   that, so, but not everyone had suffered a financial loss to their

19   accounts.

20   Q    And of the people that were added, the additional people that

21   were added since the last time we were here, none of those have

22   actually suffered a financial loss, is that correct?

23   A    No.   Not a financial loss.

24   Q    Right. I understand.

25   A    Yeah.

1    Q      Now, drawing your attention  to the amended  Exhibit  C, you have

2    -- on the far right corner, you got the exhibit  in front  of you?

3    A      Yes, sir.

4    Q      On the far right hand corner, you -- somebody -- I should say

5    the exhibit  refers  to where  in the record  or how these  things  are

6    evidenced, is that correct?

7    A      Correct.

8    Q      And the -- when you have a number  in that column, that's

9    referring  to an exhibit  number?

10   A      Yeah, to a trial  exhibit  number.

11   Q      Okay. So, all of those  things  were  admitted  -- those  numbers,

12   numerical  designations, all of those  were  admitted  as exhibits

13   during the course  of the trial?

14   A      Yes, sir.

15   Q      The other  items  that are referred  to, like for example  case --

16   Chase  spreadsheet  dash Darriell  Watkins, those  were not introduced

17   during the course  of the trial.

18           Is that correct?

19   A      Correct.

20   Q      And then where  it says see Chase  spreadsheet - fraud  case,

21   that also was not an exhibit, is that right?

22   A      Correct.

23   Q      So, those  things  were not proven  beyond a reasonable  doubt  at

24   the trial  because  they weren't  admitted  as exhibits, is that right.

25   A      No, sir.   They were just not admitted  as exhibits  in trial.

1    Q     The -- also item six where it says photo of Chase card with

2    Moore ID in Atlanta, it says "testified."

3          What does that mean?

4    A     The photo with the Chase card with the ID of Moore was one of

5    the exhibits.  I didn't put the exhibit number down.  Mr. Borgman

6    came in and testified at trial.

7    Q     That was also, I think, testified to at the last sentencing

8    hearing too, right.  That --

9    A     I believe so.

10   Q     Okay.  And then item 30.  Chase spreadsheet once again

11   Darriell Watkins same thing it wasn't introduced at trial?

12   A     Correct.

13   Q     Any other references to Chase spreadsheet, Darriell Watkins,

14   those were not admitted exhibits?

15   A     Correct.

16   Q     USPIS mail theft complaint on item 45, that also was not an

17   exhibit at trial, right?

18   A     Correct.

19   Q     And then item 51, same thing, right?

20   A     Yes, sir

21   Q     Now of all of these victims that are alleged or some of which

22   have been proven at trial, some of which are recently alleged, of

23   all of them, have you established that Willie Harris directly was

24   involved in the -- in the identity theft or card fraud or whatever

25   involved in each and every one  of these incidents?

1    A    I can't say yes to that.

2    Q    You can't say yes. Okay.

3         Is it true, sir, that in some instances, that other

4    individuals acted to obtain the identity information of some of

5    these alleged victims?

6    A    I can't say yes to that, because I don't know exactly how they

7    received or obtain the victim's information.

8    Q    Okay.  So, in some of these -- obviously, the charge here --

9    one of the charges was conspiracy. And Mr. Harris has been

10   convicted of that, right?

11   A    Yes, sir.

12   Q    But in some of these instances, you don't have any direct

13   evidence that you know of that links him specifically to any -- to

14   some of these instances, is that correct?

15   A    I would say yes to that.

16   Q    But in every instance, is it true that some co-conspirator is

17   linked to all of these?

18   A    I would say no because some of these were identified by the

19   banks based on phone numbers that accessed the accounts, based on

20   the addresses that the cards were sent to, based on the authorized

21   users who were added.

22        So, it's multiple reasons why these -- that link these

23   names together to this case.

24   Q    Right.

25        And that's -- I think we are -- maybe you misunderstood

1    my question.

2           Is it true that in every of these instances, that someone

3    in this case, one of the defendants or unindicted coconspirators,

4    somehow was linked to each and every one  of these transactions?

5    A    Yes.  Somebody was linked to them.

6           MS. HOUSTON: I just --

7           MR. FOLEY:

8    Q    However it didn't necessarily have to be Willie Harris

9    directly?

10   A    Correct.

11   Q    And just so that we are fair in sentencing here, was this

12   Exhibit C Amended C, was that a similar exhibit introduced in

13   sentencings of other co-defendants in this case?

14   A    Amended C.  No.  I just created that.

15   Q    Okay.

16   A    Couple days ago.

17   Q    Okay.  Were -- was something similar to that introduced in the

18   other sentencings, if you know?

19   A    Yes.  For every individual involved, there was a victim

20   list --

21   Q    Okay?

22   A    -- submitted.  Yes.

23   Q    And to your knowledge  -- you were here for each sentencing?

24   A    Might have been one or two that I was out of town for couldn't

25   make.

1    Q     But you have a ready, firsthand knowledge of what happened at

2    those sentencings?

3    A     I know for each individual I was the one who created the

4    victim list.

5    Q     Okay. Was there a victim list of over 50 individuals

6    introduced in each one of those sentencings?

7    A     No.

8    Q     Okay.  Were there victim lists that were fewer than 50?

9    A     Yes.

10   Q     Okay.  And were there any where victims were listed in a

11   number of over 50?

12   A     Say that again.

13   Q     Were there -- besides Mr. Harris's sentencing here today, did

14   you -- are you aware of in any other exhibits that were introduced

15   during sentencings of any other co-defendant that included victims

16   alleged in a number of 50 or more?

17   A     It's possible, but without looking at them, I can't say

18   definitely.

19   Q     So you don't know for sure?

20   A     No, sir.

21   Q     Okay.

22         And with regard to the monetary losses claimed concerning

23   co-defendants, the amounts that were introduced in those

24   sentencings were much lower than for this Defendant, is that

25   correct?

1    A    It's possible, yes.

2    Q    Okay.

3        MR. FOLEY: That's all I have.  Thanks.

4        THE COURT:   Anything else, Miss Houston?

5        REDIRECT EXAMINATION BY:

6        MS. HOUSTON:

7    Q    Inspector Frink, Mr. Folly kept using the word "instances."

8        I just want to make sure we are clear, when we talk about

9    instances, when you look at Government's Exhibit D, you reference

10   the phone number (404) 567-2322.  And how is this -- how is that

11   phone number associated with this case again?

12   A    It had accessed a couple victims' accounts and Mr. Harris

13   called Munster PD Detective Janiga from that phone number.

14   Q    And the victims whose accounts were accessed, they were

15   victims whose information was entered at trial.

16       Is that correct?

17   A    Yes.  I believe so.

18   Q    And with respect to -- he talked about instances, but he

19   wasn't clear, the 4447 Grant Street in Gary, Indiana, that's one of

20   the addresses that was associated with this fraud scheme during the

21   trial, is that correct?

22   A    Correct.

23   Q    And with respect to Darriell Watkins, during the course of the

24   investigation, during the course of the trial, was it indicated

25   that she was an unindicted coconspirator in this case?

1    A     Yes.

2    Q     And with respect to Government's Exhibit E, when you look at

3    the bottom of the page, Mr. Bohl's name, B O H L, again what

4    address is associated with the change that was made to his Chase

5    account?

6    A     4447 address in Gary.

7    Q     And with respect to Government's Exhibit F, and Mr. Boardman,

8    that specifically relates back to a card that was actually taken

9    during the execution of the search warrant, correct?

10   A     Correct.

11   Q     And it had a Jarod Moore ID and the credit card?

12   A     Yeah, the name on the credit card was Jarod Moore.

13   Q     And with respect to G 1 and G 2, those are -- let's talk about

14   G 2.

15         It identifies Robert Sanders as the person who

16   compromised Mr. Sandon's account?

17   A     Yes.  The name that was added to that card.

18   Q     And Mr. Sanders was one of the co-conspirators in this case,

19   is that correct?

20   A     Yes.

21   Q     And with respect to Mr. Tessler in Government's Exhibit G 1,

22   the names Katrina Thomas or Thompson were added to his account?

23   A     Yes.

24   Q     And was there testimony from Alnese and Diontria Frazier that

25   they used that account number?

```
1    A    They used that name.  Yes.

2    Q    And they obtained IDs in that name, correct?

3    A    Yes.

4    Q    And during the course of the trial, was it acknowledged that

5    some of this criminal conduct actually occurred in Georgia?

6    A    Yes.

7              MS. HOUSTON: Nothing further, your Honor.

8              THE COURT:  All right.  Let me ask you this.

9              What I want to make clear on, Amended C that's where you

10   have all of what you're saying are victims in this case?

11   A    Yes, sir.

12             THE COURT:  I just want to focus on the individuals, so,

13   1 through 60 are individual people, correct?

14   A    Yes, sir.

15             THE COURT:  And what I want to know is for each one of

16   those people, did they have -- did something actually happen to

17   their account as opposed to simply a Defendant or a co-conspirator

18   possessing their identification?

19   A    Either that account was accessed, meaning somebody called in

20   trying to change the name or the address on the credit card.

21             THE COURT:  Or an actual new card was issued under

22   another name?

23   A    Yes, sir.

24             THE COURT:  All right.

25             Anything else, Mr. Foley?
```

1          MR. FOLEY:   Yes, if I may.

2          THE COURT:   Yeah, sure.

3          RECROSS-EXAMINATION  BY:

4          MR. FOLEY:

5     Q    Just to follow up with what the Court asked, the -- we know

6     that obviously, certain people have had their accounts compromised,

7     have had authorized -- quote, unquote "authorized", but

8     unauthorized people added to their account, and cash advances,

9     credit card purchases.  Obviously, that's all illegal.  It's

10    fraudulent.  And the Defendant certainly was convicted of some of

11    that.

12         With regard to the individuals the Court was referring

13    to, there are some people who's means of identification were

14    somehow obtained by someone, but they never suffered any loss, is

15    that right?

16    A    Correct.

17    Q    And was there -- of all of those individuals, was there anyone

18    whose means of identification was, say, for example, found on the

19    Defendant or some other Defendant, but it was never used to your

20    knowledge?

21    A    Yes.  There were individuals who were found in the notebooks.

22    Q    Okay.  So, you've got -- how many people in the notebooks?

23    A    I don't recall, top of my head.

24    Q    Okay.  Well, there were two -- at least two different

25    notebooks, right?

1   A    Yes.

2   Q    There was the one that was confiscated in Atlanta, Georgia?

3   A    Yes.

4   Q    From his car, right?

5   A    Yes, sir.

6   Q    And I mean, when I say "his," for the record, defendant's.

7   And the other one that I'm aware of was at the bank in Munster, is

8   that correct?

9   A    Correct.

10  Q    That you ultimately received from Janiga?

11  A    Yeah, Janiga.

12  Q    And you have no idea how many names were in those notebooks?

13  A    I'm thinking it might have been seven or eight in one from

14  Munster, and maybe three or four in the one from Atlanta.

15  Q    Okay.  And to your knowledge those means of identification

16  that were contained in those notebooks -- and some of them were

17  complete, some were incomplete, is that right?

18  A    I believe all of them had name, addresses, phone numbers,

19  credit card number, date of birth, Social Security Number.

20  Q    But to your -- what you're testifying to here to today, that

21  those individuals -- that information that's listed in those

22  notebooks, that -- to your knowledge, nothing else was done with

23  those means of identification besides being in those notebooks?

24  A    Correct.

25  Q    Okay.  Is there any -- besides that, is there any one else --

1   else's information that was found someplace besides one of those

2   notebooks, that -- that that's all that was done. It was found and

3   you have no knowledge or information or evidence that anything else

4   was done?

5   A    Not that I know of.

6   Q    Okay. So, with regard to the rest of them, something else was

7   done with the information like a phone call made to a credit card

8   company trying to compromise the account or add a user or something

9   like that?

10  A    Yes, sir.

11  Q    Were there any other notebooks that were found besides the two

12  that I mentioned?

13  A    No, sir.

14  Q    Okay. Were -- was there any other information pertaining to

15  identity -- identification, individual identification that was

16  found on, say, a slip of paper, or somewhere else?

17  A    Yes.  That was a slip of paper that had been tore out a

18  notebook that was found on Darriell Watkins at the bank. And I

19  believe that was Mr. Mark Sulsman, and he came and testified.

20  Q    That was one that was compromised?

21  A    Yes.

22  Q    Is that right?

23  A    Yes.

24  Q    There was also, I believe, at least one slip of paper that was

25  found in the defendant's residence with a name and some information

1   on it too, is that right?

2   A    Yes.  There was a page that had been ripped out of a notebook

3   that was on his bedroom floor.

4   Q    And that had account -- or identification information on it?

5   A    Yes, sir.

6   Q    To your knowledge was that information used in any other way

7   besides being on that slip of paper?

8   A    No.  I would have to look at that name to -- to know for sure.

9   Q    Okay.  But to your knowledge as you sit there, you don't know?

10  A    Yeah, I don't know.

11        MR. FOLEY:  Okay, no other questions.

12        THE COURT:   Anything else, Miss Houston.

13        REDIRECT EXAMINATION BY:

14        MS. HOUSTON:

15  Q    Just to be clear, Inspector Frink, Amended C is just based on

16  information of individuals who either suffered a loss or their

17  identities -- or some attempt was made to access -- to utilize

18  their personal identifying information through either address

19  change or -- Amended C represents individuals whose credit cards

20  were compromised, correct?

21  A    Yes.

22  Q    It also represents individuals where names were added without

23  their permission, correct?

24  A    Yes.

25  Q    This does not include that list of individuals in those two

1    books referenced by Mr. Foley, correct?

2    A    I'm just looking at the names, and I'm not seeing some names

3    that were in the notebook, so, I would say this is -- does not have

4    the names that were in the notebook.

5    Q    So, you went through the exhibits, correct?

6    A    Yes.

7    Q    And these are trial exhibits that were admitted, correct?

8    A    Yes.

9    Q    And the other documents, exhibit D, E, F, G and H, those are

10   just supplemental documents as to how these individuals were

11   identified based upon the fact that Chase said their accounts were

12   compromised, correct?

13   A    Yes.

14   Q    I ask you again, Inspector Frink, these names in Amended C

15   only represent the victims who have been identified as having their

16   accounts compromised, is that correct?

17   A    Yes.

18            MS. HOUSTON: Thank you, Your Honor.

19            THE COURT:  Anything else, Mr. Foley?

20            MR. FOLEY: No.

21            THE COURT:  All right.  Sir, you may step down.

22            (Witness excused).

23            THE COURT:  All right.  Anything else that you wish to

24   present, Miss Houston?

25            MS. HOUSTON: No, your Honor.

1          THE COURT:  Mr. Foley, anything else you wish to present
2     on this issue?

3          MR. FOLEY: No, your Honor.

4          THE COURT:  All right.  So, I'll hear from you now, Miss
5     Houston on why I should reconsider my earlier ruling.

6          MS. HOUSTON:  Your Honor, is here fine?

7          THE COURT: Yes.

8          MS. HOUSTON: Yes. Your Honor, it's the Government's
9     position that based upon application note 4 E of the Sentencing
10    Guideline 2 B 1.1 B 2 B that these victims -- first of all,
11    "victim" is the ones who suffered an actual loss, which the Court
12    determined at the prior hearing.

13         In looking -- which is under Application Note 1 where you
14    talk about the actual loss.

15         But they also talk about the fact that a person includes
16    any individual, corporations or companies. So, the individuals
17    that were identified in Amended C and the corporations identified
18    which added Apple and Best Buy under Application Note One are
19    applicable for those were the actual loss.

20         Now, in going to Application Note 4, it's been carved
21    out, a special argument because of identity theft victims, that you
22    don't have to suffer a loss. It's any individual whose means of
23    identification was used unlawfully or without authority.

24         So, in incorporating all -- if you look at the individual
25    victims, 1 through 60 of Amended C, all of these individuals' means

1    of identification was used without their authority.

2         And so, it's the Government's position that based upon --

3    as I earlier argued, the Crime Victims Rights Act and the Mandatory

4    Victims Right Act and the V R R A, that I'm obligated to present to

5    the Court all of the victims whose means of identification was used

6    without their authority.

7         With respect to the businesses, in Amended C, 61 through

8    69, they fit under Application Note 1 because they are corporations

9    or businesses.  And so, it's the Government's position that we have

10   a total of 69 victims.

11        Even if the Court were to carve out the -- from Amended

12   C, number 3, 4, 5, 30, 45, 51 and 55, you would still have over 50

13   victims.

14        And in this case, the -- it's clear there are over 50

15   victims based upon the definition of what a victim is and the

16   application notes.  And we'd ask that the Court reconsider the

17   number of victims as being over 50.

18        THE COURT:  All right.  Thank you, Miss Houston.

19        Mr. Foley, any response?

20        MR. FOLEY:  Yes.  Just for the record, I would renew the

21   motion that I made previously about the Court reconsidering, but in

22   light of the fact we have heard evidence, yeah, I just want to say

23   a couple things.

24        It's a close call, even if you accept everything on

25   Exhibit C as being -- Amended C, I think it's 63,  and some of them

1    are not double counted but almost double counted because you have

2    financial institutions that actually incurred the financial loss,

3    and a number of victims who are double counted within that.

4            The other thing that I think is hazy and questionable is

5    the unlawful use or without authority requirement of the

6    Application Note 4 E, in that the inspector did testify under

7    re-redirect, I believe it was, that all of these people listed on

8    Amended C had something done to compromise their account or

9    attempted to compromise their account, and that these people from

10   his recollection weren't listed or weren't some of the individuals

11   who were in these notebooks.

12           And I'm not sure if he's correct in that testimony or not

13   because he seemed a little shaky with regard to that with regard to

14   his recollection.

15           However, there is a number of exhibits listed in this

16   Amended C that I just got today, and I don't know if the notebooks

17   are one of these exhibits.  I don't know.

18           If that is in fact true, then that would be incorrect --

19   it would be something that I could cross-examine him on, but I

20   can't because I don't have the time -- I just received this.  I

21   can't go through hundreds of exhibits to try to cross-examine him

22   on those points.

23           The only thing I'm saying is actual -- actual, the

24   victims, no question about it, there is 20 or some that were

25   testified to in the last hearing.

1          With regard to the subsequent -- the addition of --

2     additional victims, I'm not sure if I can adequately attack them or

3     the existence of them.

4          However, if the Court were to grant the reconsideration

5     and to put the two levels back on Mr. Harris, I would ask and I

6     will ask in another argument, that the Court consider that the

7     number of victims are just over the number of 50.

8          It's not like 200 or a hundred or whatever.

9          And that in looking at previously, the sentences of other

10    defendants, other defendants were not hit with all 60 some victims,

11    although they are all part of the same conspiracy. I think they

12    were hit with a lot less and restitution a lot less.

13         Those are just factors that I would ask the Court later

14    on to consider if the Court chooses to reconsider.

15         THE COURT: All right. I am going to reconsider my

16    earlier ruling. Under US Sentencing Guideline 2 B 1.1, it provides

17    for a two level increase if the offense involved 10 or more victims

18    and a four level increase if the offense involved 50 or more

19    victims.

20         And earlier in this sentencing hearing, I was somewhat

21    led astray by Application Note One of the sentencing guidelines.

22    That's where I was consulting to determine whether or not somebody

23    is a victim.

24         Unfortunately, the presentence report did not alert me to

25    -- and frankly, neither did the Government, to Application Note 4

1    E.

2              In any event, which does carve out sort of a special

3    category of victim of -- identification theft.  But Application

4    Note One defines victim as quote "any person who sustained any part

5    of the actual loss determined under Subsection B 1"; or B, "Any

6    individual who sustained bodily injury as a result of the offense."

7              But again, as I note, Application Note 4 E carves out an

8    exception to or an addendum to the definition of the term "victim"

9    as a special category of identity theft.

10             So, Application Note 4 E provides that for cases

11   involving means of identification, "victim" means, quote, "Any

12   victim as defined in Application Note One," or "Any individual

13   whose means of identification was used unlawfully or without

14   authority."

15             What Application Note 4 E is attempting to do is to

16   account for the impact that identity theft or those types of crimes

17   have on card holders who may have -- who may not have actually lost

18   money, these individuals even though they have been fully

19   compensated or reimbursed, again, even if they have been fully

20   reimbursed, they must often spend significant time resolving credit

21   problems and related issues.  And such lost time may not be

22   adequately accounted for in the loss calculation under the

23   guidelines.

24             That's a quote from United States versus Sandoval,

25   S A N D O V A L, 668 Fed. 3d, 865 at 868.  It's a Seventh Circuit

1    case from 2011.

2          And it is sort of explaining the reason Application Note

3    4 E exists, and the reason it carves out this additional category

4    of victims in this type of case.

5          Therefore, so long as an individual's identity was used

6    for a fraudulent purpose, for example, to obtain a credit card,

7    they are a "victim" quote, unquote, pursuant to Application Note 4

8    E.

9          Again see United States versus Sandoval, which is

10   directly on point.  In that case, it involved a similar credit card

11   fraud scheme as the one we have here.

12         In that case, the Court rejected the defendant's argument

13   that the people who merely had to replace their credit cards were

14   not sufficiently inconvenienced by the fraudulent conduct to be

15   considered as victims under 2 B 1.1, but the Court held that each

16   of the individuals whose card numbers the victim used, quote, "Had

17   to spend time talking to his or her respective credit card issuer

18   to verify the fraudulent charges, reverse the charges and close the

19   reissue -- and reissue the card."  So, it was reasonable for the

20   Court to conclude that those individuals were victims under the

21   meaning of 2 B 1.1.

22         See also United States versus Vasquez, 673 Fed 3d, 680.

23   It's a Seventh Circuit case from 2012.

24         So, the key question is, 4 E only applies if somebody's

25   means of identification was quote, unquote "used."

1   And what that means is, it has to be quote, "actively

2 employed to further the purpose of the conspiracy or scheme."

3   That's from United States versus Rabiu, R A B I U, 721

4 Fed. 3d, 467 at 472.

5   In other words, just possessing the identification is not

6 enough.  The Defendant or co-conspirator has to actually attempt to

7 do something with that fraudulent identification or with that

8 identification.

9   And in this case, according to Inspector Frink whose

10 testimony I find to be completely credible, he has put together

11 this chart, Amended Exhibit C, which lists all of the names of the

12 victims.  And it's the reason I asked him, was there something that

13 actually happened to these peoples' accounts.

14   In other words, did somebody try to call the credit card

15 company to add a fraudulent user to the account or to change an

16 address or to do something.  And he said the answer is yes.

17   So, Amended Exhibit C reflects the victims in this case

18 who in some way, shape or form had their identification used by a

19 co-conspirator in this case, or by somebody connected to this case

20 by a variety of means.

21   See also, United States versus Hall, 704 Fed. 3d, 1317.

22 That is a 11th Circuit case from 1013.

23   What that case holds is that people whose identifying

24 information has been transferred by the Defendant or a

25 co-conspirator are not victims when the co-conspirator had not

1    attempted to use the information.

2           And of course, that's distinguishable from our case where

3    the evidence is that for all of these victims listed in Exhibit --

4    Amended Exhibit C, the Defendant or others involved in this

5    conspiracy in some way attempted to access those accounts, and at

6    that point those people are deemed to be victims under Application

7    Note 4 E.

8           So, for those reasons, I am going to reconsider my

9    earlier ruling, and I will apply the victim enhancement under

10   2 B 1.1 B 2 B because the number of victims here exceeds 50.

11          All right.

12          I believe that is the end of all of my guideline findings

13   in this case.

14          So, let me state the guidelines as follows.

15          There is an initial offense level in this case of 7.  12

16   points were added by virtue of the amount of loss found to apply to

17   this case.

18          An additional four points were added because of the

19   number of victims based on the ruling I just made.

20          I also found that under 2 B 1.1 -- 2 B 1.1 B 10, that

21   this case involved either sophisticated means and/or that involved

22   an attempt to move the -- or relocate the fraudulent scheme from

23   one jurisdiction to another.

24          So, under 2 B 1.1 B 10, two additional points were added.

25   Two additional points again were added because it was found that

1   the Defendant used a minor in the commission of the offense under 3

2   B 1.4.

3           I did find that the Defendant was a manager, supervisor

4   of the -- this activity under 3 B 1.1, for a three level adjustment

5   upwards, plus a two level adjustment for obstruction of justice.

6           That left -- that leaves a total offense level in this

7   case of 32.  The criminal history category is three.

8           And that leads to a range of suggested incarceration

9   under the guidelines of 151 to 188 months.

10          The fine range is 17,500 to 175,000.

11          Supervised release on Count 1 is two to five years.  On

12   Count 4, 5, 6, 8 and 9 is one to three years, and Count 10 is one

13   year.  Restitution is in the amount of --

14          MS. HOUSTON: I have a dollar amount.

15          THE COURT:  Yeah, what is that new number.

16          MS. HOUSTON: $299,298.67.

17          THE COURT:  Restitution is in the amount that -- that

18   reflects the subtraction that we talked about earlier -- in the

19   amount of $299,298.67.

20          And there is a special assessment of $100 due on each

21   count of conviction for a total of $700.  Without repeating any

22   previously expressed objection, is that all accurate as to the

23   guideline computations as I found them?

24          Mr. Foley?

25          MR. FOLEY:  With the previous objections preserved, yes.

1          THE COURT:  Miss Houston.

2          MS. HOUSTON: Yes.

3          THE COURT:  Why don't we take about a ten minute break,

4    and we will come back out I'll hear whatever arguments or whatever

5    you want to present by way of -- requesting an either below

6    guideline sentence or an above guideline sentence.

7          Okay.  So, about ten minutes.

8          (Short recess)

9          (Whereupon, the following proceedings were resumed in

10          open court, reported as follows:)

11         THE CLERK:  All rise.

12         THE COURT:  All right.  You can be seated.

13         MS. HOUSTON:  Your Honor, Mr. Foley and I realize that

14   with respect to Count 10, that's the consecutive on top of the 151,

15   and we neglected -- I neglected to --

16         THE COURT:  Oh, yeah.  I'm well aware of that.

17         That's unrelated to the guideline computation.

18         MS. HOUSTON: Thank you, Your Honor.

19         THE COURT:  I'm aware of that.

20         All right.  All right.

21         Mr. Foley, as the lawyer for the Defendant, is there

22   anything that you wish to present to me by way of evidence or

23   argument before I sentence him?

24         Any other evidence that you wish to present or just

25   argument on the 3553 A factors?

1          MR. FOLEY:  Two things besides just a general argument.

2          The -- at the defendant's request, I had filed a motion

3     for a departure based upon substandard confinement.

4          Did you want to hear that?

5          THE COURT:  Yeah, whatever you want to present along

6     those lines.

7          MR. FOLEY:  Okay.  With regard to that, the Defendant has

8     been housed in Kankakee, I think most of the time, a non-Federal

9     facility.  And he has been there for quite some time, and in the

10    Jerome Combs Center.  And due to the substandard conditions

11    contained therein, believes that he should be released -- at least

12    a downward departure should be considered based upon the facts

13    contained in the motion.

14         And I don't want to go through and belabor everything.

15    It's pretty much laid out in the motion, so I would request the

16    Court to consider that.

17         Second, I don't know if you want the Government to

18    respond --

19         THE COURT:  No, I'm going to hear from you.  I'm going to

20    hear from the Defendant.

21         Let me just ask, Miss Houston, do you have any additional

22    evidence that you're going to wish to present or just by way of

23    argument.

24         MS. HOUSTON:  The only thing, rather than the Government

25    proffering, Supervisory Deputy US Marshal Melanie Thompson can

1    address the issue regarding the substandard, because I don't feel

2    comfortable proffering that, your Honor, without someone actually

3    testifying to that.

4              THE COURT:   Let's hear her testimony, and then I'll go

5    back to you, Mr. Foley, on this issue.

6              THE COURT:   Raise your right hand and take an oath.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        MELANIE THOMPSON

3    called as a witness by the  Government , being first duly sworn to

4    testify the truth, the whole truth, and nothing but the truth, was

5    examined and testified as follows:

6                DIRECT EXAMINATION  BY:

7                MS.  HOUSTON:

8    Q    Can you state your  name for the  record , your title and the

9    agency for whom you're currently employed?

10   A    Melanie Thompson.  Supervisory  Deputy US Marshal , United

11   States Marshal Service.

12   Q    And Supervisory  Thompson , are you familiar  with the Defendant

13   Willie Harris?

14   A    Yes.

15   Q    And are you familiar  with the Jerome Combs Detention Facility

16   in Kankakee , Illinois?

17   A    Yes.

18   Q    And prior to your testimony today, were you able to read the

19   motion that the Defendant  filed regarding downward departure based

20   on substandard confinement  in a non-Federal  facility?

21   A    Yes.

22   Q    Based upon that, did you contact the Jerome Combs facility?

23   A    I did.

24   Q    What if any information  did you determine regarding any

25   grievances  that the Defendant  filed with Jerome Combs with respect

1    to the issues he raised in his motion?

2    A    There were none as it pertains to the issues he outlined in

3    his motion.

4    Q    And what if any complaints did he file with respect to the

5    issues he raised in his motion?

6    A    None.

7    Q    None with Jerome Combs Facility?

8    A    No.

9    Q    Can you tell us what if any medical needs were taken care of

10   for the defendant  Willie Harris while he was at the Kankakee

11   facility?

12   A    I know there was a request for some dental work that he put in

13   for, and it was taken care of.

14   Q    And what if any information have you determined by your

15   contact with the Jerome Combs facility on whether or not the

16   Defendant has requested to participate in any program while being

17   housed in Kankakee?

18   A    He's never requested.

19            MS. HOUSTON: Nothing further.

20            THE COURT:  Anything from you, Mr. Foley?

21            MR. FOLEY:  Just a couple questions, your Honor.

22            CROSS-EXAMINATION  BY:

23            MR. FOLEY:

24   Q    Good morning -- or afternoon.

25            The Federal  facility around here that would house an

1    inmate would be the MCC, the closest one?

2    A    BOP facility? MCC is a BOP facility.

3    Q    I'm sorry, I mis -- the closest non-state facility or non-city

4    facility that the Federal Government would use to house an inmate

5    would be the MCC?

6    A    Correct.

7    Q    And is the MCC not used for inmates around here because of it

8    being overcrowded or what?

9    A    No.  MCC is overcrowded sometimes.  We normally try to get

10   inmates that are sentenced and designated into MCC.

11   Q    Okay.  Would there be room for Mr. Harris at the MCC if the

12   Marshal Service decided to put him there instead of Kankakee?

13   A    I don't know.  I can't answer that.

14   Q    You've read his motion, is that right?

15   A    I have.

16   Q    And he has made a number of allegations concerning the

17   substandard condition of Kankakee with regard to, if you were to

18   compare it to, for example, the MCC.  Did you read those?

19   A    I did.

20   Q    And did you find any of them to be valid or not?

21   A    I can't attest to what the conditions are at either one,

22   meaning the differences.  Like some of the things he outlined was

23   the temperature.  I don't know about the temperature and things

24   like that.

25   Q    Do you know anything about, for example, how long an inmate

1   gets to get out into the fresh air at the MCC as opposed to

2   Kankakee?  Are you aware of that?

3   A    I don't know.

4        And I don't believe that Mr. Harris has been housed at

5   MCC either.

6   Q    Okay.  And so, what you're saying, he wouldn't have personal

7   knowledge --

8   A    No, he would not.

9   Q    And what about the meals that he talks about, and things of

10  that nature?

11  A    Meaning the difference in the type of meals?

12  Q    Yes?

13  A    The meals may be different.

14  Q    You're just not aware of the difference?

15  A    I just don't know what the difference would be between the

16  two.

17  Q    And it is true though that at -- in Kankakee, that they do not

18  have contact visits; is that right?

19  A    I'm not sure.

20  Q    Okay.  But at MCC you do have contact visits?

21  A    Again I'm not sure.

22  Q    So, then when he alleges that contact visitations are allowed

23  at MCC, you don't have knowledge one way or the other?

24  A    No, and neither would he personally.

25  Q    Okay.  And about the law library, are you familiar with the

1    law library facility at the MCC?

2    A    I'm not.

3             MR. FOLEY: No other questions.

4             Ms. HOUSTON: Nothing else.

5             THE COURT:   Thank you.

6             All right.

7             Mr. Foley, let's go back to you, and -- anything else

8    that you wish to present to me before I sentence your client.

9             MR. FOLEY:   With regard to this or anything else?

10            THE COURT:   Anything.

11            MR. FOLEY:   Okay. The only thing I would say with regard

12   to this, the evidence presented by the Government really is -- it

13   is a lot of, "I don't know, I'm not sure."

14            I would just basically stand on the motion itself for my

15   client.

16            Secondly, Mr. Harris has asked me to ask the Court for --

17   to consider a downward departure -- where is the letter at -- based

18   upon, the Court has heard evidence, I believe from Mr. Harris, and

19   I think we've had some arguments pertaining to another motion

20   related to this that he at one time gave a proffer to the

21   Government, a Rule 11 proffer.  And I believe we filed a motion. I

22   think the Court's already ruled upon it.

23            The substance of that motion was that the Government

24   reneged and they offered evidence that was contrary to the proffer.

25            That's not what this motion is.  This motion is for a

1   downward departure based upon his attempted cooperation with the
2   Government back then, the fact that he did give information to the
3   Government that he believed was truthful, forthright and helpful in
4   their investigation.
5          I think Inspector Frink has testified contrary to that,
6   but my client has testified that he has given information at least,
7   for example, the identity of a co-defendant, name she was using,
8   things of that nature.
9          So, he is asking the Court to consider a downward
10  departure based upon that.
11         (Conference between counsel, not within hearing).
12         MR. FOLEY:  The other thing I did want to express to the
13  Court is I'm the third attorney in this case, and Mr. Bosch was the
14  attorney back then.  And Mr. Harris has, I believe, evidence that
15  Mr. Bosch would say that the Government said such and such.  And I
16  have reached out to Mr. Bosch and spoke to him, and he told me that
17  he doesn't recall anything about the case just for the record.
18         Did you want to hear other things or --
19         THE COURT:  Yeah, this is your opportunity to present
20  whatever you want to present to me.
21         (Conference between counsel and client,  not within
22  hearing).
23         MR. FOLEY: Mr. Harris would like to testify concerning
24  the substandard confinement.
25         THE COURT:  Well, I'll give him an opportunity to do that

1    if you'd like to or he can simply do it as part of his allocution

2    which, of course, I am going to allow him to speak to.

3              So, however you want wish to do that.

4              MR. FOLEY:   Okay

5              (Conference between counsel and client, not within

6    hearing)

7              MR. FOLEY:   I think as his right of allocution, I think

8    that would be appropriate.

9              THE COURT:   He's free to talk about whatever he wants

10   that he thinks is important to my decision making.  I don't want to

11   cut you off.  If you want to present the evidence in that form,

12   that's fine, but I'm going to hear it just the same.

13             MR. FOLEY:   Just so he doesn't forget, I'll ask him a

14   couple questions, if you don't mind.

15             THE COURT:   Sir, if you would, raise your right hand to

16   take an oath.

17

18

19

20

21

22

23

24

25

1

2                          WILLIE HARRIS

3    called as a witness by the   Defendant, being first duly sworn to

4    testify the truth, the whole truth, and nothing but the truth, was

5    examined and testified as follows:

6              DIRECT EXAMINATION BY :

7              MR. FOLEY.

8    Q    For the record, state your name.

9    A    Willie Harris.

10   Q    Mr. Harris, obviously, you're the Defendant in this case, is

11   that correct ?

12   A    Yes.

13   Q    And you've heard the testimony and representations  from

14   myself, the Government , and the witness concerning your  motion

15   related to substandard  treatment  and your request  for a downward

16   departure based upon  that for your substandard  confinement  in

17   Kankakee, is that right ?

18   A    Yes.

19   Q    Okay.  Can you tell  the Court the allegations  contained in

20   that motion that I filed on your behalf, in essence,  those are

21   things that you've told to me, is that right ?

22   A    Yes.

23   Q    All right.  And what do you base those things on?

24   A    I was first indicted in Atlanta, Georgia, I was sent through

25   transit throughout numerous states before making it to actually be

1    arraigned in Indiana.   And I spent a short period of time in

2    facilities like Oklahoma City and the MCC building prior to being

3    sent over here, so I am familiar with the differences between the

4    MCC building and Lake County and Kankakee County.

5    Q    Okay.  What are those differences?

6    A    Okay.  Well, basically what I notice is my main complaint

7    regarding my housing in Lake County and Kankakee County is that

8    they mix us with state inmates.  I'm not exactly sure if the

9    Marshal Supervisor looked into my disciplinary conduct, but it was

10   two instances where I was attacked by state inmates in Lake County

11   and Kankakee County, and I was found to not be aggressive or at

12   fault, but I don't -- I don't know what the -- I'm not exactly sure

13   if I wasn't able to verify what the policy is against the way

14   Federal inmates is housed, but I think common sense kind of tell me

15   that, you know, during my stay to fight these Court proceedings

16   that I shouldn't be housed, you know, to be in this -- for any

17   opportunity for me to be, you know, around state inmates to

18   conflict some kind of danger against me being the fact, you know,

19   we fighting two totally cases.   And that's my main complaint

20   regarding that, you know, asking that, you know, I get some kind

21   of, you know, something, you know, regarding being housed in these

22   state facilities when they grouping us with state inmates.

23   Q    Anything you want to add to that?

24   A    No.

25           MR. FOLEY:   Okay.  That's it, your Honor.

1              THE COURT:  Do you have any questions, Miss Houston?

2              MS. HOUSTON:  No.

3              THE COURT:  All right.  Thank you.

4         Mr. Foley, anything else you wish to say on your client's

5    behalf before I sentence him?

6              MR. FOLEY:  Yes, your Honor.  I filed a sentencing

7    memorandum.  I'm sure the Court's read that thoroughly, and I just

8    want to kind of embellish on that a little bit.

9              THE COURT:  Sure.

10             MR. FOLEY:  The Court obviously went through the

11   Sentencing Guidelines and made its calculations.  And obviously, we

12   have made our objections and arguments, and we live with what the

13   Court had to say.  With regard to those, there is a few things that

14   I wanted to say, and I think I've already said them, but just kind

15   of put all the thoughts together.

16             Number one, with regard to the monetary loss that's

17   pretty much already been established.  We have made our objections,

18   but we can't present any evidence to the contrary.

19             The one thing about the monetary loss, however, that I

20   did want to state is that the co-defendants have all been assessed

21   a monetary amount.  They were all convicted or involved in the same

22   conspiracy, but none of them have been hit with the entirety of the

23   -- the loss amount, the total loss amount for the entire conspiracy

24   except for Mr. Harris.

25             And so, we -- we question that.  We rely upon the Court's

1   good judgment.  We just want to express to the Court in making that

2   determination with regard to restitution that it also consider the

3   fact that other co-defendants were involved in this obviously, and

4   that they had been assessed a far lower amount than Mr. Harris.

5            His involvement, according to the evidence and what the

6   jury determined, was apparently more substantial and the Court has

7   already found that he had a managerial role at least, however a lot

8   of these losses were incurred as the result of a lot of activity

9   that was done by some of the co-defendants without any intervention

10  by Mr. Harris at all.

11           A lot of them looked like they had little pockets of

12  people that were operating on their own to some extent, so, I would

13  just ask the Court to consider that in determining monetary loss.

14           The -- with regard to number of victims, it's very

15  difficult to -- obviously, for the Court -- the Court's made the

16  determination it's over 50.  It is, I think, a difficult task in

17  determining a sentence to just cut things off at a certain

18  numerical level and just say okay, if you're above this level,

19  you're going to get four points.  If you're above that level, you

20  only get two, and if you're above another level, I think 250, or

21  whatever, you get more additional points.

22           And Congress, I'm sure said, we got to cut it off

23  someplace.  We can't make a grey area.  We can't say, well, if it's

24  35 to 70, well, you might be able to give him three or three and a

25  half or whatever.

1          They just cut it off right at 50.  And I would ask the
2     Court to consider the things that I've already said before in the
3     sentencing memorandum, that this isn't a clear cut case of the
4     exact number of victims, in that many of them had no actual loss.
5          The actual loss was really from the bank. I understand
6     that people had to go through the horrendous task of having to get
7     rid of cards, change cards, get new cards, having their credit
8     affected.  No question whatsoever.
9          That is a -- that is a definite loss, and an effect to an
10     individual, but it wasn't a pecuniary loss.  A pecuniary loss was
11     suffered by the banks.  With the banks included and the stores,
12     Gucci, there is a little bit of double counting as well.  Even if
13     you gave him the benefit of everything, you still say it's over 50
14     victims, but just over 50 victims.
15          I would ask the Court to consider that in determining the
16     sentence that it fashion a sentence which is appropriate.  And I
17     don't know if I can ask for anything specific, but I would ask at
18     least for a one level if not two level -- two level reduction down
19     to the next lower level just because of the number of victims being
20     so close to 50.
21          The other reason that I'm saying that is because not all
22     of the victims were specifically targeted or touched by Mr.
23     Harris's activity.  Even Inspector Frink, I believe, testified that
24     some of these, you know, Mr. Harris's name didn't come up at all.
25     It's other defendants, and they are all involved in the same

1   conspiracy and certainly they ought to be hit with all of the

2   number of victims.

3          However, once again, in fairness to Mr. Harris, I believe

4   the other defendants that were sentenced herein, were not hit with

5   the entire number of victims. In fact, Amended C was not even

6   prepared until Mr. Harris got sentenced.

7          So -- and I don't -- I didn't study each of the sentences

8   that were meted out, but I'm pretty sure that nobody was hit with

9   over 50 victims.

10          In any event, that's my argument with regard to that.

11          The other thing that I put in my memorandum and would ask

12   the Court to consider also is that none of the co-defendants have

13   received any period of incarceration except for Sanders. I think

14   Sanders got time served. I don't recall exactly what the period of

15   time was, but I think he may have been in jail for a couple of

16   years, three years. I'm not sure. Except for him, the

17   co-defendant that went to trial with Mr. Harris, nobody else has

18   received any period of incarceration.

19          And I understand they cooperated, but they had a large

20   involvement, many of them, in doing the same types of activities

21   that Mr. Harris was involved in. And we think that that should

22   mitigate against the harshness of the imposition of the sentence

23   with regard to Mr. Harris.

24          The other thing that I wanted to point out to the Court,

25   and I have already done this before as well, that is that the

1    guideline  requirement  that  a  couple  of  levels  be  added  for  using

2    minors  in  support  of  its  criminal  activity,  I  think  it's  3 B 1.4  of

3    the  guidelines.    And  I  discussed  this  with  the  Court  before,  and  I

4    think  the  Court  mentioned  --  mentioned  it  the  last  time  we  were

5    here,  that  it  just  doesn't  seem  fair  in  this  circumstance  to  apply

6    those  two  levels.

7              Now,  I  know  that  the  Court  has  to  follow  the  guidelines

8    and  impose  those  two  levels.

9              No  question  about  it.

10             However,  I  think  the  Court  also  does  have  discretion  in

11   imposing  sentence  in  saying,  you  know,  I'm  not  so  sure  if  this

12   would  be  appropriate  in  this  circumstance  to  increase  the  offense

13   level  by  two  given  the  facts  and  circumstances  in  this  case.

14             And  once  again,  I  have  gone  over  it  before  and  I  don't

15   want  to  belabor  it,  but  in  essence  the  two  minors  we  are  talking

16   about,  Darriell  Watkins  and  Lauren  Price,  they  were  both  very  close

17   in  age  to  the  Defendant.

18             In  fact,  I  believe  Lauren  Price  went  to  school  with  the

19   Defendant,  and  that  he  may  be  three  or  four  months  older  than  her.

20   Some  of  the  activity  that  was  --  that  occurred  with  Lauren  Price

21   occurred  when  they  were  both  minors.    And  then  she  just  happened  --

22   or  he  happened  to  turn  18  before  she  did.    And  you  know,  here  you

23   go.

24             You  got  two  levels.    So,  and  the  same  thing  with  Darriell

25   Watkins.    He  was  18.    She  was  17,  I  believe,  at  the  time  of  the

1    case that involved her.

2         And additionally she never got charged. She got charged

3    with nothing at all.

4         So, I would just ask the Court to consider those facts in

5    determining the appropriate sentence.

6         She also, even though she never got charged, Darriell

7    Watkins, she also came into this court, didn't cooperate either.

8         So, she is a little different than everybody else in,

9    number one, she was a minor, but she also never got indicted like

10   Tereza Harris and some others. And she did not come into this

11   Court and cooperate. She was uncooperative, in fact. She got on

12   the witness stand and said, you know, nothing.

13        So, the offense is of a nature that nobody likes, that is

14   identity theft, credit card fraud, but it is -- if anything, at

15   least a nonviolent offense.

16        Mr. Harris has never to my knowledge done anything of a

17   violent nature. And he started out with this activity when he was

18   a minor.

19        So, I would ask the Court to consider all of those

20   factors as well as previous facts and arguments made in giving him

21   a sentence which would be a below guideline sentence.

22        THE COURT:  Thank you, Mr. Foley.

23        Mr. Harris, do you wish to make a statement in your own

24   behalf or present any other information to me in mitigation of

25   punishment?

1          Anything you'd like to say,

2          THE DEFENDANT: Yes, Judge.

3          THE COURT: I'm going to ask you to speak slowly, okay, so

4     that my court reporter can get it down.

5          (Conference between counsel, not within hearing.)

6          THE DEFENDANT: Judge Simon, I know it all comes down to

7     or is going to come down to, you know, the Court consider, you

8     know, consider my characteristics,  the severity of the case and,

9     you know, if it showed I'm more likely to, you know, get involved

10    in more criminal activity in the future.

11         I know this is my second time being before the Court for

12    some of the crimes of this -- I mean, similar crime as this. Okay,

13    and I like to, you know, try to point out maybe the similarities --

14    I mean, the difference between the way I was persecuted in my state

15    case and this case, and the way that, you know, how my

16    incarceration has been like a big incidental for me, you know, to

17    actually show that, you know, shall I be release, five years from

18    now, today, you know, this is not knowing -- a road I would try to

19    go down again.

20         The main thing I want to point out to the court, I agree

21    to the Government to give a proffer after discovery of some of the

22    evidence within the Government's discovery.

23         I actually came to them.  Prior, during the

24    (unintelligible) investigation, I was never approach to try to  get

25    my side of, you know, this criminal activity.

1          This type of activity is actually presented to me as a

2    very youth.

3          Now, I was raised in a, you know, in a single parent

4    home.

5          I was really never financially stable.

6          You know, as far as my first case, I kind of, you know,

7    honestly kind of feel like, you know, the way it was presented to

8    me, you know, my first case was somewhat inevitable, maybe as far

9    as me facing, you know, the criminal activity I was involved in.

10          But I would like the Court to know, you know, the

11   difference between the conviction in that case, and I am grateful I

12   wasn't given jail time because I was able to pursue -- complete my

13   high school diploma.

14          And the difference between that case and this case is,

15   you know, this is the first time I ever spent in jail for a long

16   length -- period of time.  This not my cup of tea, you know.

17          I'm housed around people, you know, you know, that's, you

18   know, that's -- I never ever want to be housed around again.

19          I try to identify logic in my actions.  I can't find

20   none.  Okay.  I was able to identify some irony.  You know, the

21   irony of it is, you know, initially as a youth, even with my first

22   case, I got involved in this type of stuff or agreed to get

23   involved because of my lack of financial stability as a youth.

24          But it's like, the irony is, you know, should I get

25   released today or some years from now, I right back at square one.

1    I am adult now.  I won't have nothing.  You know, so it's really no

2    logic behind trying to go down this road again, you know, because

3    it's going to turn out the same way.

4            The Government made some comments in the past.  You know,

5    the Government stated Judge Vasquez order me to get my high school

6    education.  These were some conditions that was imposed on my

7    sentence, but Judge Vasquez' motive for imposing this was due to

8    the fact that he thought I was already in school.  I was pursuing

9    my high school education.  And even though he ordered that, that

10   wasn't nothing he had to do for me to try to pursue that.

11           You know, as a child growing up, I didn't grow up saying

12   I want to be a career criminal and  credit card fraud.  You know,

13   this was something that was brought to my attention as a youth.

14           And I'm not going to lie, it's something in so many ways

15   I became accustom to, you know, because there isn't any way at the

16   time, you know, I knew how to get money.

17           But, you know, as key people that was involved that the

18   Government was unaware of, the Government claimed they had no idea

19   how people information had been obtained, but I try my best to

20   present that to them.

21           During my proffer I also gave the Government tips on how

22   fraud could be prevented, you know.  I heard stories, you know, of

23   people in my situation who actually get paid to maybe prevent and

24   create anti fraud software.

25           So, I think with my prior, you know,  actions, you know,

1   it don't show the action of individual that may want to get out and

2   try to continue. You know, with me trying to pursue school on my

3   own, there's other stuff that I, you know, wanted to be involved

4   in, such as, as the Court know, you know, I'm -- I'm a writer, you

5   know.

6           I want to make money, song writing. I want to make money

7   -- you know, I been studying how to write screen plays for movies.

8           You know, there's things that, you know, besides this

9   that I was trying to get involved in other than criminal activity.

10          I advise, you know, that the Government -- of individuals

11  in this case was being untruthful. And I try my best to show my

12  role -- my true role in this crime.

13          You know, I think the Government in they expenses they

14  waited for the last minute to try to even get my side of the story

15  to the point that, you know, what I had to tell couldn't even be

16  verified.

17          I don't think, you know, I should be penalized just

18  because, you know -- I mean, severely penalized, when, you know, my

19  co-defendant I feel is in the same boat as I am, you know.

20          And just because, you know, in so many ways I kind of

21  feel I was singled out, but I try my best, you know, lead the

22  Government in a proper direction basically so they can know I am

23  remorseful even though I did move for a trial and went to court, I

24  want to make it clear, I never thought I was going to get acquitted

25  of all charges.

1            As I explain in the previous hearing, there certain

2     activity that was grouped within this conspiracy  that I know

3     wasn't, you know, all connected.

4            You know, I feel that individuals who was given, you

5     know, passes such as Tereza Harris, you know, I strongly -- I

6     (unintelligible) that was involved in the conspiracy.  I didn't

7     know -- I feel like I was being intimidated into,  your know,

8     pleading for her actions when she is older than me, you know.

9            And I don't understand why I should be penalized and be

10    ordered to pay, you know, for her actions, you know, when she is

11    never going to be face persecution.

12           She didn't assist the Government with persecuting  this

13    case, and, you know, it's just like minor issues, that I feel

14    should have been  remove before I enter a guilty plea.

15           And as I stated to the Court, I didn't know  all my

16    options as far as pleading guilty, but I want the Court to know

17    when I went to trial, I never though I was going to getting

18    acquitted.

19           I want to plea guilty.  During my proffer I admit, I

20    broke the law.  When I got on the stand during my trial, I broke

21    the law.  There is no way I could have got acquitte d when I never

22    thought I was going to get acquitted.

23           But, you know, I just kind of feel  like, you know, it

24    wouldn't have been in my best interest to take the plea that they

25    offer me.  And I thought that was my only option, take that plea or

1    move forward to trial, you know.

2          So, I did move for a trial against my bad judgment.  But

3    as I stated, you know, it's in my best interest, you know, when I

4    am release to try to, you know, focus on -- do whatever restitution

5    you want to give me, to focus on paying that.

6          This is my first time ever sitting in jail for a lengthy

7    period of time.

8          I understand, you know, the Court may have been fed up

9    based on, you know, certain motions I put in against my attorney --

10   previous attorneys, but I was -- in end, what I am saying is this.

11         Judge, when you gave me my bond, I was grateful for it.

12   Okay.  I don't agree with, you know, how the Government move for

13   the (unintelligible), you know.  Of course you know that, but it's

14   like when Judge Rodovich deny me bond, you have me a second chance,

15   I was trying everything in my power to show that I will be in

16   compliance, you know, like when I get out this situation, I'm going

17   to be in full compliance.

18         I don't agree, you know, eventhough you did order

19   conditions for me to have not -- not have   contact, I don't agree

20   that, you know, that a co-defendant should have been   allowed to

21   initiate contact and harass me.

22         And I was -- I wasn't able to tell her leave me alone.

23   And that, you know, resulted in a violation of my condition.

24         I don't agree with that, but I got to respect your

25   decision.

1          But I want you to take that into consideration  that, you

2    know, that kind of really mess my head up.  You know, once I sat in

3    Lake County for the first year and, you know, get a chance, you

4    know, to get my freedom back, when I got sent back to jail, you

5    know, it really mess me up.

6          You know, just like when I get a (unintelligible)  I'm not

7    going to nothing to ever, you know, you know,  break the law.

8          This is clearly -- this is my M-O.  I'm not the type of

9    person -- well, was my M-O.  I'm not the type of person that

10    burglarize no one, rob no one, but as of right now I don't know

11    anyone who can provide me with any personal identifying

12    information.

13          And whenever I'm release, I'm not going to try to locate

14    it.  Like I say, there's no logic in it.  But, you know, I been in

15    jail for three and a half years.

16          I strongly feel anything over five years is too much.

17    That's not my decision.  You know, I mean.

18          It's going to be up to you at the end, but whenever I

19    release, I'm going to try my very best to pay every dime back, and

20    I want to say one last thing  regarding victims.

21          When this was first presented to me, you know, I didn't

22    fully understand, you know, the way this type of crime affect the

23    victims, like the psychological  toll it has on the victims.

24          And, you know, I'm a person that live with hospitality.

25    I don't want no one to do nothing to me that  -- I mean, do nothing

1    to no one that I don't want them to do  to me.

2          Okay, I say here and the difference between my first  case

3    and this case, my first case, there was no  victim impact statement.

4          There wasn't any restitution order.

5          So, for me to be --  put a face with the actual victims

6    because, you know, this is a faceless crime, and, you know, the way

7    it's been committed by me and my co-defendants, I was able to get a

8    firsthand, you know, opportunity to see how this type of crime

9    affect the victims, you know, and,  you know, and I try to put

10   myself in they position, like, you know,  if I'm go to store and,

11   you know, I swipe my card  and say to the client, you know, I have

12   plenty of money.  And my credit card company tell me, you know,

13   this amount of money been taken off your account.

14         And I know my card been in my wallet the whole time, even

15   though it's not going to be a loss to me, I'm always going to be

16   paranoid, you know, to know like they  be thinking it will happen

17   again.

18         So, I fully understand, you know, the way it affect the

19   victims.   That's another reason, you know, I never try to roll  down

20   this road again.  And being the fact  this my first time ever

21   spending a long period of time in jail,  this is not my cup of tea.

22   This is not for me.

23         You know, I am pursuing  -- I was pursuing t hings, you,

24   know, such as, you know,  I's still in school.  I was trying to

25   pursue my career as song writer, was other things besides this I

1   was involved in.

2          I'm sorry. There was other  things I was involved in  that

3   the government  wasn't making you aware of, but I want you to know

4   that, you know, you know, I can lead a straight life.  I can work

5   for honest, you know. This case right here has set me back three

6   steps, and, you know, it's -- I'm going to try my best to get on my

7   feet, you know, and not  put myself in a predicament like this

8   again.

9          Thank you.

10          THE COURT: All right.   Thank you, Mr. Harris.

11          Miss Houston, does the Government  have any comments or

12   recommendations  as to the sentence I should impose?

13          MS. HOUSTON: Yes, your Honor.

14          With respect to  the argument on the downward  departure,

15   based upon  the substandard  conditions, I think Supervisory Deputy

16   US Marshal  Melanie Thompson summarized it by saying that after

17   having read  the motion  filed by the Defendant  that he never made

18   any -- never filed any grievances or complaints at the Jerome Combs

19   facility, that he did receive his medical  needs, and he never

20   requested  an opportunity  to participate in any programs while

21   housed there.

22          In addition, since he's a pretrial  detainee, the 14th

23   Amendment  is the applicable  standard.  And the test for determining

24   the constitutionality  of treatment or conditions of pre-trial

25   detainees alleging violation of their due process is whether those

1    conditions amount to punishment of the detainee.

2              In this case it does not.

3              The complaints asserted by the Defendant do not even

4    reach these levels.

5              Here he hasn't been denied any of his basic human

6    necessities, and he just didn't receive the level of comfort that

7    he demanded.  And the Constitution doesn't require a correctional

8    facility to provide comfortable jails, even for pretrial detainees.

9              You can look at the conditions imposed deminimus, and

10   clearly between the fact that he received the medical conditions,

11   that he was fed, he was housed, and the fact that he did not like

12   the blankets or he did not like the temperature, this doesn't reach

13   the level of a violation of his due process under the 14th

14   Amendment.

15             It didn't amount to punishment.

16             And Bell V Wolfish, 441 US 520, 535.  It's a 1979 case.

17             And also the determination of whether these restrictions

18   and practices constitute punishment in the constitutional  sense

19   depends on whether they are rationally related to a legitimate

20   non-punitive governmental purpose  and whether they appear excessive

21   if relation to that purpose .

22             Also, the Wolfish case,  there is no showing of an

23   expressed intent to punish the Defendant at the Jerome Combs

24   facility.  And there is no indication there is an alternative

25   purpose intended to punish him.

1             Kennedy versus  Mendoza Martinez, 372 US 144 at 168-169.

2             So, we request that his motion for downward departure

3    based upon  the substandard conditions be denied.

4             He also talks about his attempted cooperation and the

5    fact that he provided a name. As Inspector Frink testified, he did

6    not find the defendant's statements at the proffer to be of value.

7

8             In fact, he felt that he lied.  The only thing he did

9    provide is the name Chanel  Montgomery, and it should be noted

10   Alnese Frazier, who's a co-conspirator  in this case, acknowledged

11   that that was one of her identities, and that she had obtained a

12   State of Georgia ID, and that exhibit was admitted at trial.

13            Mr. Foley argues that in terms of the victims, that there

14   is some type of a double count.

15            However, he misrepresents, because in terms of victims,

16   you look at -- for the personal  and the individuals you look at

17   whether or not  their personal identifying information was

18   compromised.  Then you look at whether or not  there was a loss.

19            There is no  double counting because those victims are

20   only counted once because their personal  identifying information

21   was compromised.  And whether they -- it was actually compromised

22   or they suffered a loss, they are only counted once.

23            With respect to the businesses or the merchants, again,

24   they suffered a loss, and they can only be counted as a victim if

25   they suffered a loss.

1          He talks about -- references how the other --
2    co-conspirator defendants were treated.  And it's clear that the
3    Defendant was the conduit for the dispersement of the credit cards
4    in this case.

5          None of these individuals went out who cooperated or
6    participated in this conspiracy obtained these credit cards on
7    their own.

8          They were -- they either gave the Defendant their
9    personal information or utilized a fictitious name wherein he took
10   them to get fake IDs or convinced them to use IDs of other
11   individuals.

12         So he was the conduit for the disbursement of the credit
13   cards which is why he, as the Court has determined, had some
14   leadership role in this.  Again, he acted while he was on state
15   supervision for similar conduct.

16         Inspector Frink was the investigator on that case.  And
17   even though Judge Vasquez sentenced the Defendant, he continued in
18   the same criminal {vein.

19         The difference is he moved his criminal conduct
20   throughout different jurisdictions in the country.

21         He talks about the fact that there are other things that
22   he was getting involved in, but here he supported his lifestyle on
23   the backs of these victims by using their credit cards.

24         He admitted that had he broke law, yes, but he only
25   admitted that he did it in Georgia.

1        And it's the Government's position that he admitted that

2  in hopes that since that's outside our jurisdiction we couldn't

3  pursue him on it, but it was clear that the jury determined that

4  the defendant's criminal  conduct initiated here and that he acted

5  both in Wisconsin and in Georgia.

6        He talks about the fact that there was no  restitution

7  order in the state case, but when he testified  he admitted  that he

8  had over 60,000 -- at least $50,000 in cash without having any

9  legitimate work history.  Clearly that money, it can be argued,

10  came from the fraud that he committed in the state case.

11        He testified -- he tells the Court he wouldn't want this

12  done to him.  Yet, he was sentenced by Judge Vasquez and continued

13  on with his criminal  conduct.

14        The only reason he doesn't want it done to him is because

15  he's been caught.

16        He said he would lead a straight life.  That's what he

17  told Judge Vasquez when he was sentenced in the state case where

18  he's continuing  -- where he continued his criminal  conduct.

19        It's the Government's position that this Defendant is

20  only remorseful  because it is now -- he is now at the point where

21  he realizes he is actually going to be sentenced, that the delays

22  have stopped, that we are at a point where this Court is going to

23  make a determination  of how long he will be housed in the Bureau of

24  Prisons.

25        The Government  filed its sentencing memorandum.  And we

1   believe that -- that the timeframe for the Defendant between 151

2   and 180 months, we have argued for an upward departure as they have

3   argued for downward.

4        We based our argument on Section 5 H 1.7, the role in the

5   offense, and also on Section 5 H 1.9, the defendant's dependence on

6   criminal activity for a livelihood.

7        I am going to start with 5 H 1.9. This Defendant has

8   repeatedly shown a pattern of criminal conduct.  His entire life,

9   as short as it is, has been engaged in a livelihood that's based on

10  income derived from his criminal conduct. He has never held a job.

11       Lauren Price testified that she got him a job briefly but

12  he didn't want to do that.

13       He has survived expressly on the funds that he received

14  from either the victims in the state court or the victims in this

15  case before the -- before this Court.

16       And based upon that, we believe that this is a 3553 A

17  factor, which would allow the Court to do an upward departure on

18  this Defendant.

19       And I won't go into further detail because it's contained

20  within my motion.

21       We also look at the role in the offense under 5 H 1.7.

22  Again, this Defendant --

23       THE COURT:  Can I just stop you there, on this one.

24       MS. HOUSTON: Yes.

25       THE COURT:  Because what it says is that a Defendant's

1   role in the offense is relevant in determining  the applicable

2   guideline range , ie, role in the offense  but is not a basis for

3   departing from that range .

4             MS. HOUSTON:  But it does say --

5             THE COURT:  I don't understand what you're saying.

6             MS. HOUSTON: Under subsection D of 5-K 2.0, it says you

7   can look at it.  You don't have to, Your Honor, but you can look at

8   it.

9             We'd also argue that as Inspector Frink testified we have

10  our 60 plus victims, but there were other victims who this

11  Defendant was prepared to victimize, the individuals in the

12  notebook that was obtained by Detective Janiga, Munster, the

13  notebook that was seized down in Atlanta when the search warrant

14  was executed .

15            So, it's the Government's position that this Defendant

16  has -- is not showing remorse, that he is someone who has a

17  propensity to disregard and show total disrespect for the Court,

18  and we'd ask that the Defendant , if not an upward departure ,

19  receive the maximum under the guidelines .

20            THE COURT:  All right .  The Supreme Court has modified

21  the Federal Sentencing Act and made the Sentencing Guidelines

22  advisory .

23            It used to be that the Sentencing Guidelines  were

24  mandatory .  Judges like myself had to follow the guidelines, but

25  Booker and the cases following Booker demoted the guidelines , and

1   made them advisory instead.

2          And so, what that means is that I have to certainly take

3   into account what the Sentencing Guidelines advise, but I'm not

4   required to follow them.

5          The guidelines are now one factor, along with a whole

6   host of other factors, that I have to take into consideration  when

7   I sentence a Defendant.

8          But I cannot arrive at a sentence with a thumb on the

9   scale in favor of the guidelines.  In other words, the guidelines

10  are neither more important nor less important than all of the other

11  factors that I have to take into consideration.

12         So, in addition to the Sentencing Guidelines, I have to

13  take into account the nature and circumstances of the offense, the

14  history and characteristics of the Defendant.  I have to be

15  concerned about fashioning a sentence that promotes respect for the

16  law, that reflects the seriousness of the offense, that provides

17  just punishment for the offense.  I have to be concerned with

18  deterring criminal activity, both specific deterrence, that is

19  deterring Mr. Harris himself from committing additional crimes, but

20  also the concept of general deterrence, whereby sentences have to

21  send a message to the community that certain types of behaviour is

22  not going to be put up with, and hopefully that message will deter

23  others from committing offenses.

24         I have to be concerned with have avoiding unwarranted

25  sentencing disparity among similarly situated defendants.  And

1   ultimately, the goal is to arrive at a sentence that is sufficient,

2   but not greater than necessary to achieve the statutory goals of

3   sentencing.

4          I have a Defendant before me today who is -- I believe

5   he's 25 years old now.

6          He has had, I believe, one prior employment with a movie

7   -- a movie house, but other than that, really no history of

8   employment.

9          He does have one prior conviction for a similar offense.

10  I will note that he was -- he was born and raised in Gary. He's

11  raised, you know, in a very poor environment, single parent family.

12  The Defendant has had essentially no contact with his father, who I

13  believe has been in prison since the early 1990s, based on a murder

14  conviction.

15         There is some indication that the Defendant has a history

16  of anger control problems when he was young. And he was diagnosed

17  in elementary school with having an emotional handicap. He did have

18  -- admit to a prior arrest for excessive alcohol use when he was

19  younger. There is no reported -- he also admitted that he lost

20  considerable sums of money gambling.

21         He really has no vocational skills. He's only had one,

22  as I mentioned, legitimate job in his life. That employment lasted

23  only a few weeks.

24         So, that's essentially the biography of Mr. Harris, other

25  than the criminal activity that he's engaged in.

1          Criminal activity in this case is extremely serious. The

2    -- there are dozens upon dozens upon dozens of people who have had

3    their identities essentially stolen from them.

4          And I think as Mr. Harris sort of aptly points out, at

5    the time somebody's committing such an offense, in the defendant's

6    -- from the defendant's point of view, this is just some faceless,

7    nameless person out -- somewhere out in the world who may be

8    inconvenienced by what's taking place, and that it's just some

9    credit card company that's picking up the bill.

10          But what this trial demonstrated to me, and I think was

11    shown that the Government paraded through here a number of people

12    who have had their identities compromised by this Defendant. And

13    they present really sort of the effect that that has had on their

14    lives.

15          It's a nightmare. It's a nightmare for these people when

16    somebody assumes somebody else's identity. It's as if their very

17    being is being taken from them.

18          And it's exacerbated in this case when, frankly, I listen

19    to those undercover -- undercover, but the recordings that were

20    made of the Defendant calling the various credit card companies and

21    trying to persuade them to add some phony person onto these

22    victims' accounts.

23          And that was just jarring to me. Candidly.

24          It was arrogant. It was disrespectful, the way in which

25    Mr. Harris treated those attendants. He is screaming at them.

1   He's cursing them out up one side, down the other. It's a level of

2   boldness, which I found really jarring, and I found that evidence

3   to be extremely compelling.

4           So, we have computed the guidelines, and of course, the

5   guidelines, because it's a very serious offense, treat it very

6   seriously.

7           So, the defendant's been given a four level adjustment

8   because of the number of victims in this case, and rightfully so.

9   I respectfully disagree with Mr. Foley. I don't think this is a

10  case where it's kind of a close call and, gee he's just over 50, so

11  let's cut him a break.

12          That may apply to some of these other applications that

13  I'm going to talk about in a minute, but not on the number of

14  victims. This is well in excess of 50. And each of those people

15  were victimized because they had their account in some way

16  compromised by this Defendant, or by his cohorts, and of course,

17  under the concept of relevant conduct he is accountable for that.

18          So, he is given a two level increase because it involved

19  sophisticated means, and that this operation was moved from Indiana

20  to Georgia. There is also evidence that it was carried out in

21  Wisconsin, and I believe Illinois, he also was given a substantial

22  increase because he was a -- there is no question that the evidence

23  at least in my mind is that he was a manager or supervisor of

24  criminal activity.

25          And it's also abundantly clear that throughout the

1    process, Mr. Harris perjured himself.

2           And that I previously discussed that at the earlier

3    sentencing here.  So, for all of those various reasons, the

4    guidelines start piling up in a case like this.  As a result the

5    guidelines in this case suggest a sentence of 151 to 188 months not

6    including Count 10.

7           Now, the Defendant has -- well, first let me talk, the

8    Government has requested an above guideline sentence in this case.

9    And I'm not persuaded by that candidly in the lease.

10          The provisions of the guidelines that the Government has

11   pointed me to, I don't think provide justification for an upward

12   movement or deviation from the guidelines in this case.

13          Indeed, I think the guidelines themselves take into

14   account all of the conduct, and that's why they are so onerous, and

15   again, I think rightfully so.

16          But, you know, Miss Houston has pointed me to 5 H 1.9

17   that deals with somebody, you know, has a criminal livelihood.  You

18   know, that may well -- I'm not saying it's completely unfounded

19   here, but under the facts of this case where the Defendant started

20   this when he was 17 years old, and under the circumstances under

21   which he was raised, and the level of his education, it's not at

22   all surprise that this is how he is supporting himself.

23          This is not a justification.  But it's certainly in my

24   mind not a reason to depart above the guidelines or deviate above

25   the guidelines.

1          The other one dealing with the role in the offense, I
2   just -- I just don't think that applies.  He's already being given
3   a three level enhancement for his role in this offense.
4          So, I am -- I am really unpersuaded by the Government's
5   request for an above guideline sentence in this case.
6          They have also pointed me to the fact that he has a prior
7   criminal record for doing the same thing, and then thumbed his nose
8   at the system and went right about continuing with his criminal
9   conduct under very similar circumstances.
10         But again that's behavior that the guidelines take into
11  account, and it's why he is now in a criminal history category 3,
12  because he committed the offense while he was on -- on probation
13  for the prior.
14         And of course, he's given criminal history points by the
15  existence of that prior.
16         So, the fact that he is now a recidivist is really taken
17  into account by the guidelines.  I don't think this is one of those
18  cases where the defendant's criminal  history is underrepresented
19  such that it would justify an above guideline sentence.
20         So, I'm unpersuaded by a request for an above guideline
21  sentence here.
22         Now by the same token, the Defendant has made a number of
23  arguments as to why he should receive a below guideline sentence,
24  and in the main, I disagree with those as well.
25         The first here is he's pointing me to this alleged

1    substandard pretrial confinement over in Kankakee.

2             He contends that the conditions at Kankakee are

3    substantially worse than other Federal facilities like the MCC.

4    The problem at the beginning is there is really no evidence that's

5    been presented to me on the issue other than the defendant's own

6    testimony here.  And all that he testified about was the fact that

7    his complaint was that he was being housed with state inmates.

8             And perhaps they present some different level of threat

9    to other inmates, and that it's not good -- it's not good

10   correctional practice to house state inmates with Federal inmates,

11   but that to me doesn't -- that's a matter that's up to the Bureau

12   of Prisons and the Marshal Service, but I really didn't hear any

13   evidence that Kankakee facility is, in fact, substandard.  But even

14   if it is in different ways, people -- inmates who are held at

15   Kankakee are treated differently than the MCC, I don't believe that

16   under the facts of this case, it would justify a below guideline

17   sentence.

18            I'm not even sure what 3553-A factor it is germane to.  I

19   suppose it would go to the issue of what is a just punishment, but

20   again I'm not convinced that under the facts of this case the

21   Kankakee conditions are so poor as to justify a below guideline

22   sentence, and indeed, the testimony of the deputy marshal here

23   today confirmed that, you know, Mr. Harris never filed any

24   complaints, received appropriate medical treatment in that

25   facility, didn't file any grievances.

1        And so, based on the record that I have before me, I
2   don't believe that that's a basis to deviate below the suggested
3   guideline range.

4        You know, I have thought about the issue and considered
5   it, but under the circumstances of this case, given all of the
6   other aggravated circumstances that I have talked about, the fact
7   that the Defendant obstructed justice, this was a far flung
8   sophisticated operation, the fact that the Defendant, until today,
9   demonstrated little remorse, and indeed at every step in the
10  processes he's really attempted to deflect blame onto others, never
11  fully accepting responsibility until his comments here today at the
12  time of his allocution, but up to that point, it's been a, in his
13  right, a full court press sort of denial of any responsibility.

14       So, under all of those circumstances, I don't believe a
15  below guideline sentence is appropriate given the conditions in the
16  Kankakee county jail.

17       The Defendant also asked me to take into consideration
18  the fact that he says that he -- you know, that he cooperated by
19  sitting down at a Rule 11 proffer, but I credit the testimony of
20  Inspector Frink.  He's testified a number of times in this case.  I
21  found him to be completely credible, reliable, experienced,
22  careful.

23       He wouldn't admit to things unless he knew it.  And he
24  testified that frankly, Mr. Harris wasn't very cooperative at all
25  and the information he provided wasn't helpful, and they believe

1    may have been misleading in some respects.  I credit that, and I

2    don't believe his sitting down for a proffer session that really

3    doesn't lead anywhere Chanel good enough basis to deviate below the

4    guidelines.

5           You know, the Defendant has also in his sentencing

6    memorandum pointed out the fact that, you know, that he -- as I

7    mentioned earlier, he grew up in a household without a father

8    figure.

9           As I mentioned his dad was in prison having been

10   convicted of murder.  You know, I'm completely sympathetic to the

11   defendant's situation, but under these circumstances I don't

12   believe it's a basis to deviate below the sentencing guideline

13   range because of the reasons I've previously stated given the

14   aggravated nature of this offense.

15          You know, there are many people who grow up under very

16   difficult circumstances and find their way in life.  And I don't

17   believe that at least under the circumstances of this case, that

18   that's a justifiable reason for doing a below guideline sentence.

19          Now, the principal issue that I think is the one that

20   takes most time to address is the Defendant has pointed out the

21   fact that many of the co-defendants in this case received much less

22   harsh sentences than what the Defendant is facing.

23          They received either home detention or probation or in

24   the case of Mr. Sanders, a more limited prison term.  And this is

25   an issue that would be relevant to the 3553 A factor of whether --

1    the fact that I need to impose a sentence that avoids unwarranted

2    sentencing disparity among similarly situated defendants.  But

3    that's the key.  The key is whether or not those others were in

4    fact similarly situated to the Defendant.  Now, they did

5    participate in the same conspiracy, and they committed similar

6    crimes, but that's about where the similarity ends.

7              Setting aside Mr. Sanders, they all pled guilty.  They

8    all admitted their wrongdoing.  They all did not put the Government

9    to the task of a protracted trial.

10             They also all cooperated, and received substantial and

11   justifiable consideration for that cooperation.  Many of them

12   testified in this trial against Mr. Harris.

13             That type of behavior is often, and ought to be, greatly

14   rewarded, and it was in this case because it's a difficult thing to

15   do to come into a courtroom and to finger somebody.  And that's

16   what they did.

17             And so, in addition to that, all of the other defendants

18   in this case were really smaller players in this offense.  If you

19   want to describe this conspiracy as -- I think it's best described

20   as a hub and a spoke; in which case Mr. Harris is clearly at the

21   hub of this conspiracy, directing others, doing the legwork, and

22   sort of directing the co-conspirators to do what he tells them to

23   do.

24             I mean he was the -- he was the mastermind behind this

25   entire endeavor, at least according to the evidence presented in

1    this courtroom.

2           All of the women who were co-defendants in this case

3    pretty much did what they were told, and I believe that.

4           And all of them essentially testified that they did what

5    Mr. Harris told them to do.

6           And I believe that.  And the evidence also suggested

7    that, whether it was from the audio recordings of Mr. Harris

8    dealing with the credit card companies or the photograph of Mr.

9    Harris hovering over the one co-conspirator as she was engaging in

10   a transaction, all of it suggested to me that Mr. Harris by far and

11   away was the driving force behind this conspiracy.

12          And so, I cannot say that there is a concern here with

13   disparity in sentencing when this Defendant is no way similarly

14   situated to the co-defendants in this case for the reasons I have

15   just stated.

16          There -- the other issue is it is true that they had

17   smaller relevant conduct, but it was because their knowledge of the

18   conspiracy was pretty well limited to what they did.

19          So, each of these co-conspirators were not tagged with

20   the totality of the loss here, but that was because their relevant

21   conduct was more limited as to what they reasonably could have

22   foreseen.

23          So, for all those reasons, I just don't see the disparity

24   in sentencing is a basis here that helps Mr. Harris at all.

25          The one area that does bother me that I do think there

1   ought to be some consideration here for the defendant deals with

2   this use of a minor. There is no question under the technical

3   reading of the Sentencing Guidelines, it's applicable in this case.

4         But the practical considerations that I think really are

5   undermining or that are driving that sentencing factor is that when

6   somebody uses a minor in a way that attempts to control them, uses

7   the fact that they are an adult and they are dealing with a kid,

8   and they coerce the kid or cajole the kid into doing something they

9   may not otherwise do. I mean, the fact of the matter is the

10   Defendant in this case was a couple of months older than the quote

11   unquote "minors" involved here. And so, it's a ridiculous

12   application of that "use of a minor" enhancement under the

13   guidelines.

14         I just don't think it makes any sense under the -- under

15   the circumstances of this case.

16         I understand you have to draw a line somewhere, and they

17   have drawn the line at age 18, but where one of the defendants is

18   just on the other side of the line and the other Defendant -- or

19   the minor is just below the line, I just don't think it makes any

20   sense to tag somebody with a two level enhancement.

21         So, even though I've properly computed the guideline, and

22   given the two level enhancement, I do have the authority now to

23   disagree with the guideline. And under the application in this

24   case, I do disagree with it for the reasons that I have stated.

25         And so, I have arrived at the following sentence that I

1  intend to give.  I'll give counsel one final chance to make any
2  other objections or comments, but pursuant to Title 18 United
3  States Code Section 3551 and 3553, as modified by United States
4  versus Booker, it's the judgment of the Court that the Defendant is
5  hereby committed to the custody of the Bureau of Prisons for a term
6  of 132 months on each of Counts 1, 4 and 5, and a term of 120
7  months on each of Counts 6, 8 and 9 to be served concurrently.
8        In addition to this 132 months, the Defendant is
9  sentenced to a term of 24 months on Count 10, and that shall be
10  served consecutively to the terms of imprisonment on the other
11  counts, for a total term of imprisonment of 156 months.
12        The Defendant will then be placed on three years of
13  supervised release.  This term consists of concurrent terms, three
14  years of supervised release on Counts 1, 4, 5, 6, 8 and 9, and a
15  one year term of supervised release on Count 10.
16        Defendant shall not commit another Federal, state or
17  local crime.  While on supervision, he shall comply with the
18  following mandatory conditions.  As I mentioned, he shall not
19  commit another Federal, state or local crime.
20        The Defendant must report to the probation office in the
21  district in which he is released within 72 hours of release from
22  the custody of the Bureau of Prisons.
23        He shall not unlawfully possess a controlled substance
24  and shall refrain from any unlawful use of a controlled substance.
25  He shall submit to one drug test within 15 days of release from

1  imprisonment, and two periodic drug tests thereafter as determined
2  by the Court.
3        The Defendant shall not possess a firearm, ammunition,
4  destructive device or any other dangerous weapon.
5        The Defendant shall cooperate in the collection of DNA as
6  directed by the probation office.  The Defendant shall comply with
7  the 15 standard conditions that have been adopted by this Court.
8  In addition, he shall comply with the following special conditions.
9  Defendant shall not incur new credit charges or open additional
10 lines of credit without the approval of the probation office unless
11 the Defendant is in compliance with the installment payment
12 schedule.
13       The Defendant shall provide the probation officer with
14 access to any requested financial information.
15       The Defendant shall participate in the a general
16 equivalency degree, GED preparation course, and obtain his GED
17 within the first year of supervision to the extent he hasn't
18 already done that.
19       The Defendant shall participate in a substance abuse
20 treatment program and abide by all the program's requirements and
21 restrictions which may include testing for the detection of alcohol
22 or drugs of abuse at the discretion of the probation office.
23       While under supervision, the Defendant shall not consume
24 alcoholic beverages or any mood altering substance which overrides
25 the no excessive use of alcohol language that's in standard

1    condition number 7.

2         Defendant shall pay for the cost of any participation in

3    the program but not to exceed his ability to pay for it.  I am

4    giving this special condition of supervision given what's detailed

5    in the presentence report, and the defendant's substantial alcohol

6    use and the concern over that.

7         The Defendant shall also participate in a mental health

8    treatment program and shall abide by all the program requirements

9    and restrictions.

10        Defendant shall pay all or part of the cost for

11   participation in the program not to exceed his ability to pay for

12   it.

13        It's ordered that the Defendant shall pay restitution to

14   the United States District Court Clerk.

15        Miss Houston, could you remind me again of that number.

16        MS. HOUSTON: The total number.

17        THE COURT:  Yeah 298 --

18        MS. HOUSTON: $ 299,298.67.

19        THE COURT:  And which of the four victims does the amount

20   get deducted from.  Do you know that?

21        MS. HOUSTON: That's the total.  We have already deducted

22   the American Express amount.

23        THE COURT: Okay.  But --

24        All right.  So --

25        MS. HOUSTON:  I can -- the original --

1           THE COURT:  The original amount to American Express was

2    77,791.  There has to be an amount deducted off of that.

3           MS. HOUSTON: Correct.  I can give you those figures.

4           THE COURT:  What is that new number.

5           MS. HOUSTON: The new number for the reduction is

6    6,907.01.

7           907.01.

8           THE COURT:  $69,907.01 (sic)

9           MS. HOUSTON: $6,907.01.

10          THE COURT: I don't understand that.

11          MS. HOUSTON: Are you asking what should be deducted from

12   American Express?

13          THE COURT:  I'm asking what the total amount that

14   American Express should --

15          MS. HOUSTON: I'm sorry, Your Honor,

16          THE COURT:  Have you done the math, I guess is what I'm

17   getting at.

18          MS. HOUSTON: $70,848.30.

19          THE COURT:  Okay.  so, the Defendant is ordered to pay

20   restitution to the United States District Court clerk in this

21   building.  The amount is due immediately.  It's to be disbursed to

22   the following victims.

23          JP Morgan Chase in the amount of $175,414.46.

24          Discover Financial Services $41.959.83.

25          Citibank, $11,040.08.

1          American Express , $70,884.30 for a total amount  of

2     $299,298.67.

3          That restitution  obligation shall be paid in a joint and

4     several  liability with all of the co-defendants in this case, Amber

5     Fields, Lauren Price, Alnese Frazier, Diontria Frazier, Robert

6     Sanders, Shana King and Joinette Davis.

7          If the Defendant is unable to pay restitution in full at

8     the time of sentencing, which he obviously will not be able to,

9     then restitution shall be paid at a minimum rate of $150 per month

10    commencing 30 days after placement on supervision until the amount

11    is paid in full .

12         Pursuant to United States versus Boid, the Defendant may

13    pay any portion of this restitution from any wages he earns in

14    accordance with the Bureau of Prisons Inmate Financial

15    Responsibility Program. Although participation in that program is

16    voluntary, the Defendant should note however that failure to

17    participate in the program while incarcerated may result in the

18    denial of certain privileges to which he might otherwise be

19    entitled while in prison and that the Bureau  of prisons has the

20    discretion to make such a determination .

21         Any portion of the restitution that is not paid in full

22    at the time of the defendant 's release from the imprisonment shall

23    become a condition of his supervision .

24         The Defendant shall notify the US Attorney's office  in

25    this district within the 30 days of any change of mailing or

1    residence that occurs while any portion of the restitution remains

2    unpaid.  He's ordered to pay a special assessment of $100 on each

3    count to which he has been convicted, a total of 700.

4            I am not imposing any fine in this case given the

5    defendant's poor financial condition as set out in the presentence

6    report makes it unlikely that he will be able to pay a fine, so I'm

7    going to waive the fine in this case.

8            I am going to order at this time -- I'll enter a final

9    order of forfeiture as to the items that the jury found at trial

10   were directly traceable to the offense of conviction, and I'll be

11   entering that order today.

12           In addition to that, I am going to be entering an order

13   denying the pending motions.

14           There was a motion for a judgment of acquittal  that the

15   Defendant filed.  There was also a motion for relief because of the

16   Government's violation of the Rule 11 proffer.

17           There was also a motion for return of items forfeited,

18   and a motion to produce evidence about the number of victims and

19   loss amounts.

20           All of those were presentencing motions.  I have put them

21   altogether in one order, an opinion which I'll issue today.

22           All right.  The sentence that I have just given is

23   slightly below what the guidelines suggest for the reasons that I

24   have stated, my disagreement with the application of the use of a

25   minor.  Had that not been given in this case, I -- or not applied

1    in this case, it's otherwise a middle of the guideline sentence,

2    which I believe to be entirely appropriate for the reasons I've

3    outlined in detail earlier.

4           All right.  Counsel, do either of you know of any reasons

5    why the sentence should not be imposed as stated?  Mr. Foley?

6           MR. FOLEY:  None, except my client has mentioned that

7    with regard to the forfeiture, he was requesting that his two

8    computers be returned to him.  And if not that, that the -- his

9    personal information be returned to him off of those computers.

10          THE COURT:  These are two of the computers that the jury

11   determined were directly traceable to the offense, is that right?

12          MS. HOUSTON:  Your Honor, the computers were -- they were

13   forfeited.

14          THE COURT:  That's part of the --

15          MS. HOUSTON:  Correct.

16          THE COURT:  The forfeiture order?

17          MS. HOUSTON:  Correct, correct.

18          THE COURT:  So, that's denied.

19          Anything else then, Mr. Foley?

20          MR. FOLEY:  No, your Honor.

21          THE COURT:  Miss Houston.

22          MS. HOUSTON:  No, your Honor.  I just wanted to alert the

23   Court that the Government did file its motion for money judgment

24   order forfeiture, and that does not require a jury determination.

25   That is a Court determination, and it's detailed in the order.

1          THE COURT:  I haven't had a chance to review that.  And

2    I'll wait to see if the Defendant -- that is a different issue,

3    right.

4          MS. HOUSTON: Absolutely.

5          THE COURT:  From the sentencing.

6          All right.  All right.  So, I do now order the sentence

7    imposed as stated.

8          Mr. Harris, you've heard the judgment of the Court

9    imposing sentence upon you.

10          Pursuant to Rule 32 J of the Federal Rules of Criminal

11    Procedure, I advise you that you can appeal your conviction, and

12    you also have a statutory right to appeal your sentence under

13    certain circumstances if you think it was contrary to law.

14          With few exceptions any notice of appeal has to be filed

15    within 14 days of the judgment being entered in your case.  And if

16    you want to file an appeal but you're unable to pay for the costs

17    of an appeal, you may apply for leave to appeal in forma pauperis,

18    which means you may be able to pursue an appeal at no cost to you.

19          Mr. Foley, I just remind you of your duties to perfect

20    that appeal should your client wish you to do so.

21          You will remain responsible for his representation on

22    appeal unless you're relieved by the Court of Appeals upon motion.

23          Do you want me to make a recommendation as to placement

24    for Mr. Harris?

25          (Conference between counsel  and client, not within

1    hearing).

2            MR. FOLEY:  Yes, your Honor.  My client would request

3    that the Court recommend that he be placed in an institution near

4    the Chicagoland area so his family could visit with him.  And also,

5    if Court could recommend that he be eligible for or looked into his

6    eligibility concerning a drug treatment program.

7            THE COURT:  I will include both those in the judgment and

8    commitment order that the Defendant be placed -- I think it's well

9    justified -- in the residential drug and alcohol treatment program

10   offered by the Bureau of Prisons, as well that he be housed as near

11   as possible to Chicagoland area so he can have the continued

12   support of his family.

13           All right.  Anything else from you, Mr. Foley?

14           MR. FOLEY: No, your Honor.

15           THE COURT:  Miss Houston, anything else from you?

16           MS. HOUSTON: No, your Honor.

17           THE COURT:  All right.  Thank you.

18           Good luck, Mr. Harris.

19           (WHICH WERE ALL THE PROCEEDINGS HAD).

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3         I, Sharon Boleck Mroz, being a duly  authorized

 4    and acting official court reporter for the

 5    United States District Court, for the Northern

 6    District of Indiana, Hammond Division, do hereby

 7    Certify that I did report in machine shorthand the

 8    foregoing proceedings, and that my shorthand notes

 9    So taken at said time and place were reduced to

10    typewriting under my personal direction.

11         I further certify that the foregoing typewritten

12    transcript constitutes a true record of said

13    proceedings, so ordered to be transcribed.

14

15                    ____S/ Sharon Boleck Mroz_____

16                         Sharon Boleck Mroz

17                         Official Court Reporter

18                    Dated:   May 8, 2014

19

20

21

22

23

24

25
```